748 So.2d 814 (1999)
Anthony Terrell McCLENDON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01057-COA.
Court of Appeals of Mississippi.
June 29, 1999.
Rehearing Denied September 28, 1999.
Certiorari Denied December 9, 1999.
*815 Thomas M. Fortner, Robert M. Ryan, Andre' De Gruy, Jackson, Attorneys for Appellant.
Office of the Attorney General by W. Glenn Watts, Attorney for Appellees.
BEFORE SOUTHWICK, P.J., COLEMAN, AND THOMAS, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Anthony Terrell McClendon was convicted by a Hinds County Circuit Court jury of deliberate design murder and sentenced to life in prison. On appeal he argues that the aiding and abetting instruction was erroneous, a manslaughter instruction was needed, and the prosecution should not have withheld results of a polygraph examination. No reversible error is shown and we affirm.

FACTS
¶ 2. The following is a review of the evidence, some of it contested, that is consistent with the verdict. Anthony Terrell "Rell" McClendon and Michael Towers worked together on a roofing job. After work on December 13, 1995, McClendon took Towers, McClendon's cousin Elbert Silas, and fifteen-year old Antonio Lewis for a ride in an automobile that he had borrowed. McClendon wanted to collect $800 that he believed Leon Hughes owed him as the result of a drug transaction. McClendon drove to the home of Henry Sims, who was called "Bonshay," looking for Hughes.
¶ 3. McClendon found him there and had him get in the backseat of the car between Silas and Lewis. McClendon then began asking Hughes for the money. Hughes stated that he had some money at his sister's apartment in Clinton, and the group next traveled there. McClendon and Hughes got out of the vehicle and knocked on the apartment door, but no one answered. McClendon became angry and slapped and punched Hughes. The two got back into the vehicle. On the drive towards Bolton, where McClendon's aunt and cousin lived, McClendon told Hughes to "say hello to his sister when he got *816 there." One witness said that McClendon's sister was dead.
¶ 4. When they arrived at the home of McClendon's aunt, the group parked behind a hedge so that the vehicle was not visible from inside the residence. McClendon then got out and entered the trailer, talked briefly to his cousin, then went back outside. Shortly thereafter McClendon went back inside, talked to his cousin again, then again went outside. He pulled out a pistol and told Hughes to get out of the car. Hughes refused and was forcefully removed from the vehicle. McClendon then shot Hughes once in the buttocks and once in the calf.
¶ 5. The gunshot wounds left Hughes unable to walk. McClendon, Towers, Silas and Lewis dragged his body down a gravel road which led to a nearby pasture. Hughes was crying and begging for his life. Towers struck him on the head with a brick. Hughes was in and out of consciousness, and was carried over a barbed wire fence and into the pasture. McClendon told Silas to give his gun to Lewis so that he could kill Hughes. Silas refused and walked toward the fence with Towers. McClendon then gave his weapon to Lewis, who was described at trial as mentally "slow." McClendon, Silas, and Towers walked away while Lewis shot Hughes once through the temple. All four returned to the trailer, had glasses of water, then returned to Jackson.
¶ 6. McClendon, Silas, Towers, and Lewis were indicted for the deliberate design murder of Leon Hughes. McClendon was tried separately in Hinds County Circuit Court August 4-5, 1997. The jury found him guilty and sentenced him to a term of life.

DISCUSSION

I. Aiding and abetting instruction
¶ 7. McClendon argues that the trial court improperly granted the State's aiding and abetting instruction, in violation of Hornburger v. State, 650 So.2d 510 (Miss. 1995). According to McClendon, the instruction allowed the jury to convict him of murder in the absence of proof of every element of the crime beyond a reasonable doubt. We first look at instruction S-2:
The Court instructs the Jury that [1] each person present at the time, and consenting to and encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hand committed the whole offense; [2] and if you believe from the evidence, beyond a reasonable doubt, that the Defendant, Anthony Terrell McClendon, on or about December 13, 1995, was present at the time of the incident which resulted in the death of Leon Hughes, and that he consented to, encouraged or participated in the conduct causing his death, and did then and there wilfully, unlawfully, knowingly, and feloniously do any act which is an element of the crime of murder as defined elsewhere in these instructions or immediately connected with it, or leading to its commission, not in necessary self-defense, then and in that event, you should find the Defendant, Anthony Terrell McClendon, guilty as charged of murder.
[bracketed numbers and italics added.]
¶ 8. A comparison of this instruction with the one in Hornburger reveals that they are almost identical except for the extra language in McClendon's that we have italicized. In other words, the section that follows the "[1]" appears in the Hornburger instruction. However, the second part of the instruction in Hornburger failed to inform the jury that in order to convict, it must first find that he was "present at the time, consenting to, and encouraging the commission of the crime." It merely stated that if the defendant did "any act which is an element of the crime of burglary of a building, or leading to its commission, then and in that event, you *817 should find the defendant guilty as charged."Id.
¶ 9. The court found the instruction to be improper but ultimately held that it was harmless error. Justice Banks agreed that it was error but not that it was harmless. He explained that the principle of law stated in the first part of the instructionthe definition of an aider and abettorwas absent in the second part of the instruction which purported to apply the law to the facts of the case. Hornburger, 650 So.2d at 516 (Banks, J., dissenting). The absence of the language that the defendant be "present and consenting to and encouraging the crime" allowed the jury to find the defendant guilty for "[doing] any act which is an element of the crime ... or leading to its commission...." Id.
¶ 10. The problem in Hornburger was corrected in McClendon's case. We find no error.
¶ 11. There was also an evidentiary basis for the instruction. Sufficient evidence was presented from which the jury could find that McClendon aided, counseled or encouraged others in the commission of the murder of Leon Hughes and did an act which is an element of the crime of murder or immediately connected with it, or leading to its commission. "[A]iding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition." Swinford v. State, 653 So.2d 912, 915 (Miss.1995). Towers testified that McClendon indicated his desire to have Hughes killed and gave his gun to Lewis. Testimony that a defendant provided the shooter with the gun and encouraged him to shoot the victim is sufficient to support a jury finding that the defendant aided and abetted in the murder. Jones v. State, 710 So.2d 870, 874 (Miss.1998).

II. Manslaughter instruction
¶ 12. McClendon claims he was entitled to an instruction on the lesser-included offense of manslaughter. What McClendon sought was an instruction that if he were found to have aided and abetted the crime, but without malice and while in the heat of passion, he should be convicted only of manslaughter. The instruction was properly phrased and thus the issue is whether it was supported by evidence.
¶ 13. Heat of passion has been defined as "a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." Underwood v. State, 708 So.2d 18, 36 (Miss.1998). The passion felt by the person committing the act "should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." Graham v. State, 582 So.2d 1014, 1018 (Miss.1991).
¶ 14. The evidence that allegedly supports this instruction is Michael Towers's testimony that McClendon was angry throughout the evening. According to Towers, the group arrived at the residence of a drug dealer named "Bonshay" where they expected to find Hughes. McClendon entered the residence and returned with Hughes. McClendon and Hughes were arguing. Later in the evening when Hughes was unable to obtain any money from his sister, McClendon became angry and began punching Hughes. During the trip from Clinton to Bolton where Hughes was ultimately killed, McClendon yelled at Hughes.
¶ 15. The court has held that evidence that the victim and defendant *818 were arguing before the shooting was insufficient to justify the grant of a manslaughter instruction. Carter v. State, 722 So.2d 1258, 1262 (Miss.1998). The court explained that "an argument of such minimal importance does not fall under the definition of heat of passion. There was no evidence that [the victim] struck, threatened, or provoked [the defendant] in any way so as to produce the type of immediate and reasonably anticipated anger required to rise to the level of heat of passion." Id. Similarly, a long-standing domestic dispute is not grounds for a manslaughter instruction. Graham, 582 So.2d at 1018. "There must not only be passion and anger to reduce a crime to manslaughter, but there must be such circumstances as would indicate that a normal mind would be roused to the extent that the reason is overthrown and that passion usurps the mind destroying judgment." Id. "Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter." Gates v. State, 484 So.2d 1002, 1005 (Miss.1986).
¶ 16. The trial judge found that no evidence was presented at trial to show that McClendon acted out of provoked passion, anger, rage, hatred, furious resentment, or terror. There was no "reasonable provocation" by Hughes which caused McClendon to become angry and shoot him. McClendon might consider failure to pay this debt a reasonable provocation. It is not one that would have caused an "ordinarily constituted" person to lose control. Hughes appears to have had the emotional collapse, "hollering and crying" and "begging for his life." There was no evidence of a physical assault by Hughes upon McClendon. The provocation was by McClendon, not by Hughes.
¶ 17. McClendon asserts that when a defendant requests a lesser-included offense instruction, a factor is whether a great disparity in maximum punishments between the offenses exists. Taylor v. State, 577 So.2d 381, 383 (Miss.1991). The maximum sentence for deliberate design murder is imprisonment for life while manslaughter carries a maximum sentence of twenty years imprisonment. Miss.Code Ann. §§ 97-3-21, 97-3-25 (Rev.1994). However, the disparity does not create the need for the instruction; evidence must do that. There was no basis for a manslaughter instruction.

III. Discovery violation
¶ 18. There are two documents helpful to understanding this final issue that are not in the original trial record. The State has filed a motion to supplement the record with those documents. The supreme court earlier granted the defense's motion to supplement the record to include evidence on the same issue. In the interest of fully resolving the issue we grant the State's motion as well.
¶ 19. McClendon argues that the State failed to turn over exculpatory material in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Rule 9.04 of the Uniform Rules of Circuit and County Court Practice. The State submitted Towers to a polygraph examination. McClendon was not given a copy of the report of the polygraph examiner detailing the results of the examination. There is no evidence that a transcript of the questions and answers was created or any other record of all the statements. The State asserts in its brief that a transcript of another pretrial statement by Towers was turned over during discovery. McClendon filed a motion to compel, seeking the examiner's report. The motion was denied by the trial court.
¶ 20. The polygraph examiner's report, not provided to McClendon below, was two pages long. A summary of the statements and a quote of some of them take up most of the document. The examiner's conclusions were found in this final paragraph:
The result of the polygraph exam [of Towers] was that there were deceptive responses to some of the relevant questions. *819 There were deceptive responses recorded to the question of seeing Tony shoot Leon in the head. There were deceptive responses to the question of hitting Leon with a brick. There were deceptive responses to the question of seeing Rell shoot Leon in the head. In the opinion of this examiner, based on the responses recorded, Anthony McClendon "Rell" shot Hughes in the legs and the head. It is also the opinion of this examiner that Michael Towers hit Hughes with a brick or stone. It is the opinion of the examiner that Michael Towers has not been truthful in his account of the shooting death of Leon Hughes.
McClendon argues that because the State never turned the report over, he was not able to cross-examine Towers effectively. He further claims the report may have led to more evidence with which to exculpate himself. Finally, McClendon asserts that failure to turn over the report interfered with his Sixth Amendment right to counsel and his right to confront witnesses against him.
¶ 21. The United States Supreme Court held that there was no Brady violation where the prosecution failed to turn over to the defense results of a polygraph examination taken by a State witness which indicated deception as to his involvement in the crime. Wood v. Bartholomew, 516 U.S. 1, 7, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). The court reasoned that "evidence is `material' under Brady, and the failure to disclose it justifies setting aside a conviction only where there exists a `reasonable probability' that had the evidence been disclosed the results at trial would have been different." Id. at 5, 116 S.Ct. 7.
¶ 22. In determining that the results would not have been different, the court among other matters noted that "the polygraph results were inadmissible under state law, even for impeachment purposes, absent a stipulation by the parties.... The information at issue here, thenthe results of a polygraph examination of one of the witnessesis not evidence at all." Id. at 6, 116 S.Ct. 7.
¶ 23. In Mississippi, neither the fact of the taking of a polygraph examination nor the results of such an examination are admissible into evidence. Carr v. State, 655 So.2d 824, 836 (Miss.1995). Results of a polygraph exam may not be used even for impeachment. Tavares v. State, 725 So.2d 803, 810-11 (Miss.1998). Thus, the polygraph report was not evidence. Access to the report would not have aided in McClendon's defense. There was no discovery violation.
¶ 24. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.