IRVING, J.,
for the Court:
¶ 1. In September of 1994, Moses Dab-ney, III and Jason Phalo were convicted of murdering Eddie Wilson, Jr. Dabney’s and Phalo’s convictions were reversed and remanded to the circuit court. See Dabney v. State, 717 So.2d 733 (Miss.1998). Dab-ney, tried separately from Phalo in the second trial, was convicted of murder and sentenced to life in the custody of the Mississippi Department of Corrections. Aggrieved by his conviction and sentence, Dabney presents four issues for our review. The statement of issues is recited verbatim from his brief:
I. WHETHER THE COURT ERRED IN NOT GRANTING A LESSER INCLUDED INSTRUCTION FOR “HEAT OF PASSION” MANSLAUGHTER?
II. WHETHER THE COURT ERRED IN FAILING TO REQUIRE THE STATE TO PRESENT RACE NEUTRAL REASONS FOR EXERCISING ELEVEN OF TWELVE PEREMPTORY STRIKES AGAINST AFRICAN AMERICANS IN JURY SELECTION?
III. WHETHER THE COURT IMPROPERLY ALLOWED THE STATE TO OBTAIN COMMITMENTS FROM THE VENIRE DURING VOIR DIRE?
IV. WHETHER THE COURT ERRED BY NOT SUPPRESSING STATEMENTS REPORTEDLY GIVEN BY THE DEFENDANT?
Finding no reversible error, we affirm.
FACTS
¶2. Eddie Wilson, Jr. was shot and killed at the intersection of Northside Drive and North State Street in the City of Jackson. Shortly before the shooting, Wilson and a co-worker, Tye Carney, were at their place of employment, Cowboy Ma-loney’s Electric City, on 1-55 North in *1068 Jackson. Tye Carney testified that at approximately 5:00 p.m. he was standing outside on break when he saw Wilson’s white Chevrolet Blazer pass in the parking lot. Carney testified that Wilson ran out of the building, saying that Wilson’s Blazer had been stolen and asked Carney to drive Wilson to chase after the Blazer. Carney and Wilson chased and caught up with the stolen Blazer at the intersection of North-side Drive and North State Street. Both vehicles were heading west on Northside Drive. The stolen Blazer was in the left or outside lane, and Carney’s vehicle was beside the Blazer in the right or inside lane.
¶ 3. Several witnesses testified to the following events. Wilson exited Carney’s vehicle and approached the driver’s side of the Blazer. Next, Wilson pulled the driver’s side door handle, suddenly backed away, turned his back to the driver of the Blazer and started to run. As Wilson was running away, the passenger in the Blazer raised a .380 caliber gun and fired two shots towards Wilson. While these events were transpiring, Carney was making a u-turn in the intersection in order to block and prevent the Blazer from moving. He heard two shots and saw Wilson fall to the pavement.
¶ 4. The witnesses described the persons in the Blazer by height and by the seat they occupied. Moses Dabney was described as being the passenger and the shorter of the two. Several eyewitnesses testified that Dabney shot at Wilson from the front passenger seat of the Blazer. One eyewitness testified that she saw Jason Phalo shooting at Wilson.
¶ 5. At trial, police officers testified regarding the confession made by Dabney. In the first statement, Dabney stated that he fired the gun twice under Phalo’s provocation to “shoot that n_r” but that his gun jammed. Unable to use his gun, Dabney stated that he found another gun in the Blazer and continued shooting with that gun. Dabney also told the officers that he was wearing a plaid shirt at the time of the shooting. In his second statement to the police, Dabney said that once the gun jammed, Phalo grabbed the gun and continued shooting at Wilson.
¶ 6. Other facts will be developed as needed.
ANALYSIS OF THE ISSUES

I. Did the trial comt err in not granting a lesser included instruction for “heat of'passion” manslaughter?

¶ 7. “Considering all of the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, the trial judge must submit a lesser-included instruction unless the trial court can say that no reasonable jury could find the defendant not guilty of at least one essential element of the principal charge.” Hines v. State, 749 So.2d 232, 233 (Miss.Ct.App. 1999). Moreover, the evidence must warrant an instruction on the lesser-included offense before it can be granted. Id.
¶ 8. Heat of passion is defined as a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Hines, 749 So.2d at 233. The passion or anger is suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at that time. Id. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror. Id.
¶ 9. Dabney argues the events of Wilson and Carney driving up and blocking the Blazer, and Wilson getting out before the Blazer stopped, were sudden, immediate and impulsive, disallowing any appreciable time period for deliberation of homicide. Dabney also argues that he acted impulsively, under an .excited situation, with Wilson angrily approaching the vehicle, struggling to open the door, while *1069 Phalo resisted and yelled, “shoot that n_ _r.” Finally, Dabney argues that his mild mental retardation should be taken into account in the determination of whether he was reasonably provoked.
¶ 10. In the case sub judice, a lesser included “heat of passion” manslaughter instruction was inappropriate. The facts do not support a finding that Dabney was reasonably provoked. Wilson did nothing other than attempt to open the door of his Blazer which was being occupied by Dab-ney and Phalo, the two thieves who had stolen it. Dabney and Phalo should have had some reasonable expectation that they might be accosted by the owner of the Blazer or others in an attempt to retrieve it. Moreover, Wilson was shot in the back while running away from the Blazer.
¶ 11. The Mississippi Supreme Court has held that the passion felt by the accused should be superinduced by some insult, provocation, or injury which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation. Barnett v. State, 563 So.2d 1377, 1379 (Miss.1990). Although the record reflects that the chain of events between Wilson’s pulling the door handle and Dabney’s firing shots toward Wilson occurred within a matter of seconds, Wilson’s actions did not amount to immediate provocation which would naturally and instantly produce in the minds of ordinary and reasonable men the highest degree of exasperation. Once Wilson approached the door of the Blazer, he immediately backed away and turned his back to Dabney. As Wilson was trying to escape, Dabney shot twice at Wilson. There was nothing evident in Wilson’s actions which would engender passion or fear which would cause a reasonable person to aim a gun and shoot twice at Wilson’s back as he was trying to escape.
¶ 12. Dabney further argues that Phalo’s command to shoot Dabney was reasonable provocation. This argument may be answered simply by saying the words of a cohort are certainly not the type of provocation that the law proscribes for killings in the heat of passion.
¶ 13. As to Dabney’s assertion that his mild retardation should be taken into account in the determination of whether he was reasonably provoked, the Mississippi Supreme Court, in Taylor v. State, 452 So.2d 441, 448 (Miss.1984), has resolved that argument against him. In Taylor, the Mississippi Supreme Court held that the question of whether the accused has acted in the heat of passion is to be resolved by utilization of an objective standard. Id. at 449. The standard presupposes an individual without serious mental and emotional defects. Id. Therefore, Dabney’s mental retardation, in the absence of an insanity defense, is irrelevant to the issue of whether he acted in the heat of passion.

II. Did the trial court err in failing to require the state to present race neutral reasons for exercising eleven of the twelve peremptory strikes against African Americans in the jury selection?

¶ 14. The jury was selected, sworn and seated on Monday. No Batson challenge was made during the jury selection process. The court excused the jury until Wednesday when the evidentiary portion of the trial was to commence. On Tuesday, the court took up a defense motion to suppress. Prior to the opening of the State’s case-in-chief on Wednesday morning, Johnny Harvey, who had been selected for the jury, informed the court that he learned that his daughter’s husband was related to Wilson. Consequently, the trial judge removed the juror without objection from either the defense or the State. Dabney’s counsel then objected to the seating of the first alternate juror, who was white, and moved for a mistrial. When the trial court denied the motion for mistrial, Dabney’s counsel then pointed out that during voir dire, the State had used all or nearly all of its challenges on African American jurors. When asked by the *1070 prosecutor if he was making a Batson challenge, Dabney’s counsel responded, “Yes.” The prosecutor then pointed out that it was too late for a Batson challenge and that Dabney’s counsel had utilized all of the defense peremptory strikes on white jurors. In response to the prosecutor’s detailing the racial identities of the defense strikes, Dabney’s counsel then detailed the racial identity of each of the prosecutor’s strikes.
¶ 15. The trial judge declined to require the prosecutor to give race neutral reasons for his strikes, ruling as follows:
BY THE COURT: The Court agrees that it’s too late to bring up the Batson challenge. The jury has already been sworn. There was no Batson challenge made during the jury selection process. There’s no evidence before the Court of anything other than racial neutral challenges. And also the defendant approved of the two alternates. There was no challenge of the two alternates, so obviously the defendant expressed satisfaction with either or both of the two alternates serving on this jury. Therefore, it’s the opinion of the Court there is no prejudice to the defendant. And so the Court as indicated earlier will order that the first alternate move up and replace Mr. Harvey.
So for the foregoing reasons, the Court overrules the motion for a mistrial, and in the opinion of the Court there is no prejudice to the defendant shown, and in any event, the challenge is too late. The jury has been sworn, and as stated by the jury selection process, the defendant accepted all of the jury, each and all of the jurors to be on this panel, and importantly approved of the two alternates. Anything further on that issue?
(emphasis added).
¶ 16. On appeal, the State argues that the trial court correctly held that the Batson challenge came too late. Citing Thomas v. State, 517 So.2d 1285 (Miss. 1987), the State argues that any Batson objection must come before the jury is impaneled. We agree. After discussing authorities from several jurisdictions regarding the timeliness of a Batson challenge, the Thomas court opined, “[w]e further hold that objection is timely only where made prior to the impaneling of the jury.” Id. at 1288.
¶ 17. Dabney, citing Brewer v. State, 725 So.2d 106 (Miss.1998), argues that his Bat-son challenge was timely. It is true that the Brewer court, in a footnote, said that Brewer’s Batson challenge effectively preserved the issue for appellate review. It is -not entirely clear from the Brewer opinion as to when the Batson challenge was made. It appears, however, it was made after the jury had been selected but prior to it being sworn to try the issues. We agree with the State that this fact distinguishes the Brewer decision from our case. Moreover, it is difficult to see how Dabney can make an effective Batson challenge out of the court’s seating an alternate juror who had already been accepted by him.
¶ 18. The record does not reveal the number of African Americans who actually served on the jury, nor does it reflect any reasons given for the peremptory strikes by either the defense or the prosecution. It is understandable that no such reasons would be reflected in .the record since no Batson challenge was made during the jury selection process. In the absence of a Batson challenge, neither the prosecution nor the defense is required to state his reasons for a peremptory strike. On these facts, we decline to hold the trial court in error for overruling Dabney’s belated Batson challenge. This assignment lacks merit.

III. Did the trial court improperly allow the State to obtain commitments from the venire during voir dire?

¶ 19. During voir dire, the prosecutor made the following statement to the panel:
Okay, one of the things that I predicted you’re going to hear is that this defendant was — there will be a lot of terms *1071 that will be used, mildly retarded, moderately retarded, borderline retarded. There will be a lot of special education type testimony.
and asked the following question:
Do you all assure the Court that unless that affects his ability to determine the difference between right and wrong you will not let it affect your decision as to guilt or innocence?
At trial, Dabney objected to this question as an impermissible attempt to obtain a commitment from the jury. The trial court overruled the objection and allowed the State to continue.
¶ 20. Dabney argues the State was allowed to obtain a commitment from the members of the jury regarding their judgment on the weight of psychological evidence before the jury heard any testimony on the issue. Dabney contends that obtaining such commitment violated URCCC 3.05, which requires that “no hypothetical questions requiring any juror to pledge a particular verdict will be asked.”
¶ 21. Under Mississippi law, an attorney for either side is allowed to probe the prejudices of the prospective jurors to the end that all will understand the jurors’ thoughts on matters directly related to the issues to be tried. West v. State, 553 So.2d 8, 22 (Miss.1989). What is impermissible is for an attorney to attempt to secure from the juror a pledge that, if a certain set of facts occur or are presented, the juror will vote a certain way. Id. After examining the record, we find that the statements made by the State did not require the jury to pledge a particular verdict. The prosecutor merely asked whether testimony based on Dabney’s mental deficiency would affect the jury’s judgment. This argument lacks merit.

IV. Did the trial court err by not suppressing statements reportedly given by Dabney to the police?

¶ 22. Where the trial court has denied a motion to suppress the confession of the accused, we will reverse the trial court’s decision only if the trial court’s ruling is manifestly in error or contrary to the overwhelming weight of the evidence. McGowan v. State, 706 So.2d 231, 235 (Miss.1997). Dabney argues that his confession to the police should not have been admitted because of his level of mental retardation.
¶ 23. For a confession to be admissible, it must have been given voluntarily and not given as a result of promises, threats, or inducement. Richardson v. State, 722 So.2d 481, 487 (Miss.1998). In determining whether a statement is voluntary, the trial judge must first determine whether the accused, prior to the confession, understood the content and substance of the Miranda warning and the nature of the charges of which he was accused. Neal v. State, 451 So.2d 743, 755 (Miss.1984).
¶ 24. However, there are no per se rules against admitting the confession of a mentally challenged person. Id. at 756. Thus, a confession will not ordinarily be excluded merely because the person making the confession is mentally weak. Id. at 756. The mental abilities of the accused are but one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made. McGoiuan, 706 So.2d at 235. Whether there has been an intelligent, knowing, voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances. Id. “Until it is shown that a weak-minded person has been overreached to the end that he has divulged that which he would not have divulged had he not been overreached, his voluntary confession is admissible.” Neal, 451 So.2d at 756.
¶ 25. In the case sub judice, Dabney never claimed that his confession was made under threats, coercion or promise of reward. The only evidence the trial judge had before him at the suppression hearing was evidence that Dabney’s IQ was 71. *1072 Evidence of Dabney’s IQ was given by his special education teacher who either tested him or had him tested several years prior to the murder for which Dabney was being tried. The teacher testified that she did not think Dabney could have understood his rights from reading them, but could have understood if the police read and explained them to him. The police officers testified that Dabney read the first two lines and that they read the rest and that Dabney understood his rights. We decline to hold that the trial judge’s finding regarding Dabney’s mental condition was clearly erroneous or against the overwhelming weight of the evidence. Accordingly, we dismiss this assignment of error as lacking merit.
¶ 26. THE JUDGMENT OF HINDS COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
McMILLIN, C.J., KING, P.J., BRIDGES, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. SOUTHWICK, P.J. AND MYERS, J., NOT PARTICIPATING.