# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00284-COA

**LEONARD STEVENSON A/K/A LEONARD STEVENSON, JR.**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                                        APPELLEE

DATE OF JUDGMENT:                02/10/2022
TRIAL JUDGE:                     HON. W. ASHLEY HINES
COURT FROM WHICH APPEALED:       WASHINGTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: CASEY B. FARMER
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 05/16/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., GREENLEE AND WESTBROOKS, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.    After a jury trial, Leonard Stevenson was found guilty of capital murder. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2015). He appeals his conviction and sentence on the grounds that the trial court abused its discretion by excluding his medical records, thereby prohibiting him from presenting his singular theory of defense. Finding no error, we affirm.[1]

## FACTS AND PROCEDURAL HISTORY

---

[1] This Court's docket reveals an appeal involving the same defendant in Appeal Number 2021-KA-00411-COA. The charged offenses in this separate appellate case were not "based on the same act or transaction" or "part[] of a common scheme or plan." MRCrP 14.2(a).

¶2.     The deceased, Alonzo Dukes, lived in a two-story business and residential building in Leland, Mississippi.  The building consisted of two commercial units downstairs and an upstairs residential area.  A 25-foot garage sat in the back of the building.  Once inside the garage door, a stairwell led to the upstairs unit.  Dukes owned a blue Dodge van that he had recently purchased before he died.

¶3.     Away from his home, Dukes also owned and operated a number of businesses.  He assisted a non-profit organization called Southern Health Commission.  Under this organization, Dukes advocated for and supported sexual-health awareness.  Dukes also operated the Hollywood Palace Bingo Hall, located in Greenville, Mississippi.  When Dukes was not using the Bingo Hall to host bingo games, he was renting out the Bingo Hall for special events and for entertainers to perform.

¶4.     Dukes' business ventures seemed to be expanding.  He extended cleaning contracts through Southern Health and employed several people to perform the cleaning services.  Dukes' long-time employee Roderick Bell had previously worked with Dukes' mother and continued to work with Dukes in his various business ventures.  Bell and Dukes had been friends for approximately twenty-five years.  Bell worked closely with Dukes when it came to the Bingo Hall, the cleaning contracts, and the newest venture—a skating rink called Skate-O-Rama.  Bell helped Dukes move into Dukes' Leland home.  And if individuals were coming to Dukes' home, Dukes would usually notify Bell.

¶5.     In January 2017, Dukes commercially advertised for Skate-O-Rama, which (when it opened) would be located inside the Bingo Hall.  The day after Dukes began advertising,

Stevenson and Cordero Hill came to the Bingo Hall and applied to work at the Skate-O-Rama. Bell and Dukes told Stevenson and Hill that Dukes would contact them in a month when Dukes began looking for employees.

¶6. On February 4, 2017, Bell was running late for work. He made it in around 10:00 a.m. The day before, Dukes had instructed Bell to report to the Bingo Hall and finish his work duties so they could finish getting everything ready for the skating rink. Dukes also informed Bell that he did not have to come clean at his home that morning because Stevenson and Hill were coming to do it. Dukes told Bell he would meet him at the Bingo Hall around lunchtime. However, when the lunch hour arrived, Dukes did not appear.

¶7. The rest of the afternoon passed. At approximately 4:00 p.m., Bell left for the evening and reached out to Dukes. Bell testified that he began asking others if they had heard from Dukes. No one had. Bell then called Dukes' secretary who said she had not heard from Dukes. After calling Dukes' nephew, Bell picked him up and decided to search for Dukes.

¶8. Bell and Dukes' nephew drove to Dukes' home and noticed that his roll-up garage was halfway opened. Alarmed, Dukes' nephew jumped out of the car and went underneath the garage to check on Dukes. Believing that there was a burglary in progress, Bell told Dukes' nephew to come back and stay outside. Bell immediately went to the Leland Police Department and reported a burglary in progress at Dukes' home.

¶9. Deputy PJ Lamberson spoke with Bell about his suspicions regarding a burglary in progress at the residence. After receiving Dukes' address from Bell, Lamberson drove to the location to conduct an investigation. Lamberson observed that Dukes' garage was opened

3

approximately three feet. At this time, Lamberson also noticed that Dukes' 2004 blue Dodge Caravan was not on the street or in the driveway. Lamberson then entered the home through the garage.

¶10. Lamberson searched the home and did not find any suspects. Lamberson checked the first level and then proceeded up the stairwell to the second level to check all the rooms. Lamberson found Dukes' dead body lying between the bed and the wall. Lamberson also saw that some drawers were open and that a few tables had dust markings on top of them, indicating that some items had been removed. Lamberson took pictures of the scene and then called other officers from the police station to come to the scene to conduct a search and set up a perimeter around the home.

¶11. Investigator Louis White arrived at the scene after receiving the call. White searched the residence in a manner similar to Lamberson's search. White saw that Dukes' neck had been stabbed on the left side. White also noticed bruising around Dukes' mouth. Subsequently, White found a knife at the bottom of the stairs. During his investigation, White spoke with Bell, who mentioned a few names, including Stevenson and Hill.

¶12. The Greenville Police Department informed White that Dukes' van had been found in Little Rock, Arkansas, and that Stevenson was the one driving it at the time. The Greenville Police Department notified White that some of Dukes' personal belongings were found in Greenville, Mississippi. Then, the Leland Police Department retrieved and processed the van. After processing, White found some "member" cards with Dukes' name on them, Dukes' driver's license, a Visa card, and a bottle of bleach in the van.

¶13.    Upon arrest, Stevenson was interviewed by White in Arkansas. During this interview, Stevenson stated that he went to Greenville to find employment.  Through his friend Hill, he was introduced to Dukes.  Stevenson knew that Dukes was homosexual and knew that Dukes may have been interested in him.  Stevenson said he also made it clear to Dukes that he was not interested in him and that he was at the Bingo Hall for business only.  Stevenson and Hill showed up at the Bingo Hall to pass out contraceptives and receive signatures on behalf of the Southern Health Commission, the nonprofit that "the Bingo Hall operate[d] up under." According to Stevenson, he was paid for each signature he received.

¶14.    On the morning of Dukes' murder, Stevenson stated that he was searching for additional employment opportunities and called Dukes for this reason.  Later, he was under the impression that Dukes picked him and Hill up to do some work.  Stevenson stated that he was not aware that he was going to Dukes' home.  Stevenson remained at Dukes' house for approximately one hour.  Sometime after arriving at Dukes' home, Stevenson entered Dukes' bedroom when Dukes began making sexual advances toward Stevenson by asking him to perform oral sex in exchange for financial security.  Stevenson stated that he rejected the offer, but Dukes still leaned in and kissed him on the forehead in Dukes' bedroom.  In a recorded interview with White, Stevenson said he previously told Dukes that he was not homosexual.  Stevenson said, as a result, that he felt like "[Dukes] was about to take something."  At that point, Stevenson just "snapped."  Stevenson said he began beating Dukes' head into the wall on the right side of the bed.  There were no words spoken between them. Stevenson also said he beat Dukes "helpless."  After that, Stevenson went into Dukes'

5

kitchen, grabbed a kitchen knife, and stabbed Dukes once in the neck. Stevenson stated that he knew that Dukes would die when he stabbed him in the neck. And after killing Dukes, he immediately prayed for forgiveness. Stevenson stated that if Dukes "would have kept it business, then [Dukes] would still be alive right now."

¶15.    Stevenson told White that after he killed Dukes, Hill cleaned the apartment, while Stevenson loaded up some of Dukes' electronics into Dukes' van, including one fifty-inch screen television. Stevenson stated that because he was a chess player, he realized that he could sell Dukes' electronics for a profit. Stevenson stated that throughout the rest of the day, he and Hill sold the electronics to different individuals and hid the van somewhere in Greenville.

¶16.    On March 8, 2021, the State indicted Stevenson and Hill for the capital murder of Alonzo Dukes. The State charged that Stevenson and Hill killed Dukes while engaging in the commission of a robbery. The trial was continued multiple times due to COVID-19. Stevenson pled not guilty and, through his counsel on February 4, 2022, filed a "Notice of Intent to Offer Mental Health Records Into Evidence." Stevenson attached his Life Help medical records and "Consent to Release/Obtain Information" as exhibits to the notice. Stevenson asserted in the "Notice of Intent to Offer Mental Health Records" that he "suffered from a psychosis" and that his "mental instability" was his only defense.[2]

¶17.    Stevenson's trial was held on February 8, 2022. One of the State's witnesses, Investigator White, testified that Stevenson said he had been sexually abused as a child and

_____

    [2] Stevenson's counsel filed the notice of intent citing the Mississippi Rules of Evidence. M.R.E. 803(6), 804(b), 902(2) & 902(11).

6

that was why he snapped. After the State rested its case-in-chief, the trial court gave Stevenson an opportunity to be heard on the admission of his medical records.

¶18. The State argued that the medical records should not be admitted if no accompanied medical professional testified as to how his childhood abuse affected him on the night in question. Stevenson's counsel responded that the medical records should be made a part of the record. The trial court ruled that medical records were only relevant in the event that (1) "the person is so profoundly mentally affected that they are unable to assist their lawyer in preparation of the defense and to understand and comprehend the legal proceedings," or (2) "the person at the time of the crime was so profoundly affected by some mental disease or other thing that they could not comprehend the legal consequences of their actions."

¶19. After finding that neither instance applied in the case at hand, the trial court denied the admission of the medical records into evidence. Additionally, the trial court determined that "just snapping" was not a defense and that Stevenson could not state that because "something bad happened to [him] in the past regardless of how bad it was . . . [he] [could] go out and commit heinous crimes." Stevenson's counsel responded that this was Stevenson's only defense. The trial court concluded that Stevenson could testify about his medical records and reiterated that "just snapping" was not a defense under the law. Stevenson's counsel then proffered that the medical records be entered for identification purposes only, which the trial court allowed.

¶20. Stevenson rested without testifying and without calling any witnesses to the stand. Closing arguments were heard, and then the jury found Stevenson guilty of capital murder.

The trial court sentenced Stevenson to life imprisonment without eligibility for parole. On appeal, Stevenson challenges the trial court's exclusion of his medical records.

## STANDARD OF REVIEW

¶21. "We review the exclusion or admission of evidence for an abuse of discretion." *McCammon v. State*, 299 So. 3d 873, 886 (¶41) (Miss. Ct. App. 2020) (citing *Collins v. State*, 172 So. 3d 724, 738-39 (¶14) (Miss. 2015)). "Unless a judge abuses this discretion so as to be prejudicial to the accused, this Court will not reverse the ruling." *Ousley v. State*, 984 So. 2d 996, 1002 (¶20) (Miss. Ct. App. 2007). "We reverse 'only if such discretion has been abused and a substantial right of a party has been affected.'" *Thompson v. State*, 157 So. 3d 844, 851 (¶19) (Miss. Ct. App. 2015) (quoting *Richardson v. State*, 74 So. 3d 317, 329 (¶39) (Miss. 2011)).

## DISCUSSION

¶22. Every defendant has a constitutional right to a fair trial and to present his theory of defense. *Chinn v. State*, 958 So. 2d 1223, 1225 (¶13) (Miss. 2007); *O'Bryant v. State*, 530 So. 2d 129, 133 (Miss. 1988); *see generally Ward v. State*, 479 So. 2d 713, 716-17 (Miss. 1985). Our Mississippi Supreme Court has held that "[p]sychiatric and psychological evidence is crucial to the defense of a capital murder case." *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990). And "it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Terry v. State*, 718 So. 2d 1115, 1121 (¶28) (Miss. 1998) (citing *Keys v. State*, 635 So. 2d 845, 848-49 (Miss. 1994)).

¶23. Stevenson alleged that Dukes' sexual advances triggered the trauma of his childhood sexual abuse and caused him to "just snap[]." Thus, Stevenson offered to enter his medical records documenting his childhood abuse to explain why he overreacted to Dukes kissing him. The trial court excluded the medical records as irrelevant, stating Stevenson's "just snapped" assertion was not, under the law, a recognized theory of defense. After a thorough review, we conclude that the trial court did not abuse its discretion.

¶24. To the extent that Stevenson made a heat-of-passion argument, under Mississippi law "heat-of-passion manslaughter is a lesser-included offense of murder," not a theory of defense. *Blanden v. State*, 276 So. 3d 1204, 1210 (¶24) (Miss. Ct. App. 2018); *accord* Miss. Code Ann. § 97-3-35 (Rev. 2014). Manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense. . . ." *Byrd v. State*, 158 So. 3d 1146, 1151 (¶15) (Miss. 2015). Heat of passion is "[p]assion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time." *Curtis v. State*, 298 So. 3d 446, 453 (¶18) (Miss. Ct. App. 2020). "A person may form an intent to kill from a sudden passion induced by insult, provocation or injury from another. In that moment of passion, while still enraged, if he slays the other person, the homicide may be manslaughter . . . depending upon the insult, provocation or injury causing the anger." *Windham v. State*, 520 So. 2d 123, 127 (Miss. 1987).

¶25. Nevertheless, the passion or anger must be caused "by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of

9

mind characterized by anger, rage, hatred, furious resentment or terror." *McClendon v. State*, 748 So. 2d 814, 817 (¶13) (Miss. Ct. App. 1999) (quoting *Underwood v. State*, 708 So. 2d 18, 36 (¶54) (Miss. 1998)). But "[t]his is an objective standard, and an individual defendant's emotional defects are irrelevant to the issue of whether he or she acted in the heat of passion." 3A Jeffrey Jackson et al., Encyclopedia Mississippi Law § 23:65 (3d ed. updated Oct. 2022) (citing *Dabney v. State*, 772 So. 2d 1065, 1069 (Miss. Ct. App. 2000)). The question of whether the accused acted in the heat of passion, and therefore without malice, "is an objective one, being whether a reasonable man would have been so provoked." *Lewis v. State*, 170 So. 3d 1245, 1248 (¶11) (Miss. Ct. App. 2015) (quoting *Taylor v. State*, 452 So. 2d 441, 449 (Miss. 1984)). The supreme court "has held that the passion felt by the accused should be superinduced by some insult, provocation, or injury which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Dabney*, 772 So. 2d at 1069 (¶11) (citing *Barnett v. State*, 563 So. 2d 1377, 1379 (Miss. 1990)).

¶26. In *Dabney*, this Court addressed the defendant's claim that his mild retardation should have been considered in determining whether he was reasonably provoked to shoot the deceased. *Id*. at (¶13). In addressing the claim, we noted the supreme court's prior holding "that the question of whether the accused has acted in the heat of passion is to be resolved by utilization of an objective standard[,]" and "[t]he standard presupposes an individual without 'serious mental and emotional defects.'" *Id*. (quoting *Taylor*, 452 So. 2d at 449). We therefore concluded in *Dabney* that the defendant's "mental retardation, in the absence

10

of an insanity defense, [was] irrelevant to the issue of whether he acted in the heat of passion." *Id*.

¶27. Here, Stevenson did not assert an insanity defense or claim that he lacked the ability to differentiate between right and wrong. *See Hearn v. State*, 3 So. 3d 722, 738 (¶46) (Miss. 2008) (citing *M'Naghten's Case*, 8 Eng. Rep. 718, 722 (1843)). Had Stevenson intended to allege an insanity defense, then the correct criminal procedure would have been for Stevenson's defense counsel to serve a "written notice of the intention to offer a defense of insanity" during the time set for pretrial motions. MRCrP 17.4. Rather than file this notice, as required, Stevenson's defense counsel filed a "Notice of Intent to Offer Mental Health Records into Evidence" four days before the trial began. Within this notice of intent, Stevenson's defense counsel asserted that the medical records were necessary to support Stevenson's sole defense of "mental instability at the exact time of the incident." Therefore, the actions of Stevenson's counsel make clear to this Court that Stevenson did not allege an insanity defense or the inability to distinguish right from wrong. Consequently, any evidence of childhood trauma contained in his medical records was irrelevant—and therefore inadmissible—at his trial to determine whether he murdered Dukes.

¶28. Moreover, to the extent that Stevenson alleged a diminished-capacity defense, the trial court properly excluded Stevenson's proffered evidence. "Mississippi law does not recognize diminished capacity as a defense to a criminal charge." *Lewis*, 170 So. 3d at 1248 (¶13). Evidence of diminished capacity has no bearing at the guilt phase of a trial and is only potentially relevant at certain sentencing hearings where it is necessary to show mitigating

11

circumstances. Miss. Code Ann. § 99-19-101(6)(f) (Rev. 2020) (discussing sentencing in a death-penalty case); *Stevens v. State*, 806 So. 2d 1031, 1051 (¶¶84-89) (Miss. 2001). And ultimately, the exclusion of this evidence is proper when it "does not stand up to the *M'Naghten* test for legal insanity during the guilt phase" of the trial. *Stevens*, 806 So. 2d at 1051 (¶88).

¶29. Because Stevenson did not follow our rules of criminal procedure and failed to provide evidence to support a theory of defense recognized under our law, the trial court did not abuse its discretion by excluding the medical records as irrelevant to the issue of reasonable provocation.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**