582 So.2d 1014 (1991)
Michael David GRAHAM
v.
STATE of Mississippi.
No. 90-KA-0289.
Supreme Court of Mississippi.
June 5, 1991.
Rehearing Denied July 31, 1991.
*1015 Jim W. Rose, Gulfport, for appellant.
Mike C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and ROBERTSON and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
Michael Graham and Adrienne Klasky Graham were married in 1980. In 1986, Adrienne received a divorce from Michael on the grounds of irreconcilable differences and was awarded custody of the couple's two sons.
Michael's family said that Michael changed in personality after the divorce. Michael's father developed aneurysms of the head and stomach in September of 1988. Michael would visit his father in the hospital and would talk to him but he would not talk to the rest of the family. He became withdrawn. His mother described Michael as arrogant and angry during the three-year period after the divorce.
On Christmas of 1988, Michael's family gathered at his parents' home located next door to Michael's. His three brothers and their families were all there since that Christmas would be his father's last. Mrs. Graham went next door to Michael's and asked him to come join the family. Michael told her that he did not have the time; he was too busy.
Michael's brothers, Wayne, John, and Charles, noticed the change in Michael. He became withdrawn and rejected his family and friends. Once, Michael and his young nephews started throwing rocks at each other and Michael went into the house and called the police.
Michael was represented by several lawyers during and after the divorce. Michael hired attorney Donald Sigalas to represent him in the divorce proceeding and in subsequent proceedings. Sigalas had known Michael for most of Michael's life. Sigalas also noticed a change in Michael after the divorce. According to Sigalas, he became withdrawn.
Michael hired attorney Richard Hamilton in October of 1987 to file a petition to try to get Michael visitation with his children. Adrienne responded by filing a counter-petition asking that Michael be held in contempt for unpaid child support and asking that the amount of child support be modified. Before a hearing was held on the matter, the judge met with the attorneys and indicated what he felt was a proper amount of child support. When Hamilton relayed this to Michael, Michael told him that he did not want Hamilton to represent him any more. During Hamilton's representation of Michael, Michael expressed anger toward his former wife and her father. In fact, he threatened their lives.
Sigalas filed a petition on behalf of Michael asking that Adrienne be held in contempt for refusing Michael his visitation rights. In a hearing on this matter, the court held that Adrienne's was not a willful violation. Sigalas also represented Michael when Adrienne filed a petition asking that Michael be held in contempt for nonpayment of child support. Michael, in that instance, was held to be in contempt.
Sigalas knew of one instance where Michael had hit Adrienne. That occurred one day when Michael went to Adrienne's to pick up the children and Adrienne refused him visitation. They argued, Adrienne slapped Michael, and he hit her.
Adrienne asked the court for a protective order on two occasions. Michael would show up unannounced at Adrienne's. He also made threatening phone calls to Adrienne. The court issued a protective order and enjoined Michael from harassing Adrienne. *1016 The second time Adrienne asked for a protective order, Michael was sentenced to serve ninety days in the Adult Detention Center. Michael actually served thirty days of that sentence.
Adrienne and her two sons eventually moved in with her parents because she was afraid of Michael. Adrienne worked for her father at Brumfield's Department Store in Pascagoula as a merchandise manager and buyer.
On April 3, 1989, Michael was served with process. He was ordered to appear in the Jackson County Chancery Court on May 5, 1989, to show cause as to why he should not be held in contempt as alleged by the complaint filed by Adrienne.
On April 4, 1989, two of Michael's brothers, Wayne and Charles, went to the courthouse and signed papers to have Michael picked up on a lunacy charge so that he could be evaluated. Michael was never picked up on the charge.
On the morning of April 7, 1989, Adrienne worked on some orders at home until she left for work around 10:00 a.m. On her way to work, she dropped her mother off at the beauty shop on Jackson Avenue.
Adrienne stopped at a traffic light on Jackson and Pascagoula Streets. Witnesses stopped at the light saw a gray Dodge pickup headed in a westerly direction coming up in the eastbound lane. The truck stopped beside Adrienne's car and witnesses saw the driver pick up a gun and point it at the car. The witnesses heard a shotgun blast and saw the glass in the car windows shatter.
The truck then drove off and turned south on Pascagoula Street. Two of the witnesses, Robert Auth and Craig Taylor, who were in a van owned by Jackson County Maintenance, after seeing that there was nothing they could do to help, went to see if they could find the truck. They saw the truck at the light on Convent Street. They took down the license plate number and then returned to the scene of the shooting.
Another witness to the shooting, Joseph Bourgeois, wrote down a description of the truck and what he thought was the tag number. The witnesses identified Michael Graham as the driver of the truck.
Officer Eric Rayborn with the City of Pascagoula was on duty that morning. He was on Market Street when he was advised that a shot had been fired on Jackson Avenue close to Pascagoula Street. When he arrived on the scene, he saw a black Lincoln parked in the road heading west. He noticed that both of the front windows were broken out of the car. Inside the car, he saw a female sitting in the driver's seat with her head back against the headrest. She had a gun blast to her left temple. Four witnesses told Officer Rayborn what had happened. The woman's driver license identified her as Adrienne Graham.
Michael proceeded to the office of Donald Sigalas. Michael told Sigalas that he thought he had shot Adrienne. He said that it had happened on Market Street. Sigalas offered to take him to the police department. When they turned on Pascagoula Street, Michael said that he did not want to go that way, so Sigalas took him to the sheriff's department instead.
Detective Sergeant David Tucker of the Pascagoula Police Department heard on the police radio that the truck involved in the shooting had been located in front of Donnie Sigalas' office on Market Street. Tucker proceeded to Market Street and saw the pickup. Inside the truck on the front seat, he found an ax handle and a cartridge hull. He also saw the barrel of what he thought was a high-powered rifle on the floorboard in front of the bench seat. A towel was thrown over the butt of the gun and when he flipped the towel back, he saw that it was a shotgun. The gun was identified as a twelve gauge, Remington 1100, semiautomatic, serial number M269805V.
Officer James Hunter with the Pascagoula Police Department ran a check on the tag number of the truck located in front of Sigalas' office. The truck was registered in the name of Michael D. Graham.
John Michael Allen, a forensic scientist specializing in firearm and tool mark evidence, *1017 examined the shotgun hull in order to determine if it was fired from the shotgun found in the truck. He made test comparisons and gave as his opinion that the shotgun hull was indeed fired from the gun.
Dr. Paul McGarry, a forensic pathologist, performed an autopsy on Adrienne Graham. He determined that the cause of death was due to a shotgun wound to the head which entered the left temple and exited the right temple, massively disrupting her brain. He found two buckshot inside her head. She had extensive powder stippling around the entry wound indicating that the shot was at close range, from three to five feet.
Sergeant Glen Veil with the Pascagoula Police Department participated in taking a witness statement and fingerprinting Michael Graham. Sergeant Veil turned the fingerprints over to Lieutenant Hunter. Lieutenant Hunter lifted fingerprints from the shotgun. He sent those fingerprints along with the print card he had received from Sergeant Veil to the Mississippi Crime Lab.
Lonnie Arrinder, a fingerprint examiner with the Mississippi Crime Lab, was asked to compare latent prints with the known fingerprints of Michael Graham. He found that six fingerprints had been made by the same person whose fingerprints were on the card.
Michael Graham was indicted by the Jackson County Grand Jury in its April 1989 term. The indictment charged that he did unlawfully, wilfully, feloniously and of his malice aforethought, kill and murder Adrienne Klasky Graham on April 7, 1989. Graham's trial was conducted on October 9 and 10, 1989. The jury found Graham guilty of murder. He was sentenced by the court to serve a period of life in the custody of the Mississippi Department of Corrections.
On October 12, 1989, Graham filed a Motion for New Trial in which he contended that the court erred in denying his request at trial that the jury be instructed on the lesser-included offense of manslaughter. A hearing was held on the Motion on February 28, 1989, and the court overruled the Motion. Graham appeals the rejection of his manslaughter instructions.

LAW
Graham offered three jury instructions which would have allowed the jury to consider the lesser-included offense of manslaughter as an alternative to murder. The court refused to grant the instructions. Graham contends that the court erred in so refusing because the evidence supported a manslaughter instruction.
In order to determine whether a lesser-included offense instruction should be submitted to the jury, this Court has developed a test.
[A] lesser included offense instruction should be granted unless the trial judge  and ultimately this Court  can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).
Gates v. State, 484 So.2d 1002, 1004 (Miss. 1986) [quoting Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985)]. The evidence must warrant an instruction on the lesser-included offense before it can be granted. Stevens v. State, 458 So.2d 726, 731 (Miss. 1984).
Miss. Code Ann. § 97-3-35 (1972) deals with manslaughter committed in the heat of passion. That section reads, "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter."
"Heat of passion" has been defined by this Court as:
In criminal law, a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the *1018 grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Mullins v. State, 493 So.2d 971, 974 (Miss. 1986) [quoting Black's Law Dictionary, 650 (5th Ed. 1979)]. The passion felt by the person committing the act "should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." Barnett v. State, 563 So.2d 1377, 1379 (Miss. 1990) [quoting Preston v. State, 25 Miss. 383, 387 (1853)].
The crime of murder requires premeditation or a deliberate design. Miss. Code Ann. § 97-3-19(1) (Supp. 1990). "Although our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before pulling the trigger." Blanks v. State, 542 So.2d 222, 226-227 (Miss. 1989).
If there is any evidence which would support a conviction of manslaughter, an instruction on manslaughter should be given. In Roberts v. State, 458 So.2d 719 (Miss. 1984), the Court said that the defendant's statement "I didn't mean to do it baby, my baby" was a sufficient basis for a manslaughter instruction. Moreover,
The law of Mississippi is liberal on what constitutes manslaughter on the facts, and makes considerable allowance for the frailties of human passion; ... There must not only be passion and anger to reduce a crime to manslaughter, but there must be such circumstances as would indicate that a normal mind would be roused to the extent that the reason is overthrown and that passion usurps the mind destroying judgment.
Windham v. State, 520 So.2d 123, 127 (Miss. 1987) [quoting Calvin v. State, 175 Miss. 699, 703, 168 So. 75, 75 (1936)].
Michael Graham contends that the evidence supported a manslaughter instruction. Graham differentiates his situation from that where there is some sudden provocation. He says the provocation in his case was a slow kindling which began with the divorce and was fueled by the returns to court. The process with which he was served on April 3, 1989, four days before he shot Adrienne, was the last straw. Although he did not immediately do anything, Graham contends that he was acting in the heat of passion when he killed Adrienne which suspended the exercise of judgment which an ordinary, reasonable man would otherwise exercise. Graham did not testify himself at his trial. To support his contention, he relies on the testimony of the attorneys who represented him during the divorce proceedings and on the testimony of his family all of whom noticed a change in Graham after the divorce.
In rejecting Graham's argument, the court said that it was aware that domestic disputes cause hard feelings. However, the court was of the opinion that a long-standing domestic dispute was not grounds for a manslaughter instruction. We agree. There was no evidence in this case of a sudden provocation. In fact, one of Graham's attorneys said that Graham had threatened the lives of Adrienne and her father during previous proceedings. Using the test in Gates, supra, we can say that no reasonable jury could find Graham guilty of manslaughter.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, PITTMAN and BANKS, JJ., concur.
McRAE, J., not participating.