CHANDLER, J.,
for the Court.
111. On March 8, 2004, Curtis Bennett was indicted for the murder of his wife, Connie Bennett. Bennett waived his right to a jury trial, and a bench trial was held on October 6, 2004 in the Circuit Court of Harrison County. The court found Bennett guilty of murder and sentenced him to life in the custody of the Mississippi Department of Corrections. Bennett claims there was insufficient evidence to support a murder conviction. He also contends that he was entitled to an appeal bond during the pendency of his case before this Court.
¶ 2. Finding no error, we affirm.
FACTS
¶3. Curtis and Connie Bennett were married in 1985 and had two sons. In 2003, Connie worked as an operations manager of a Hancock Bank branch in D’Iberville, Mississippi. On October 16, 2003, Bennett went to Connie’s bank branch, talked with Connie, and obtained a check for $120,500, the amount of a home equity credit line which the couple had taken out in order to build a house. Wen-dolyn Maples, a bank employee, testified that Connie said she had tried to stop Bennett from withdrawing the money and that Connie planned to contact her divorce attorney about the situation. Connie told Maples that Bennett had told her several days before to “pack her stuff and leave.” Connie told Maples that Bennett had been angry about Connie’s taking time away from home to attend functions with her family.
¶ 4. On October 20, 2003, at 2:35 p.m., Bennett cashed the $120,500 check at another bank branch in Gulfport, Mississippi. Bennett then drove to his home and hid the money under the couch. Then, at approximately 3:40 p.m., Bennett entered the D’Iberville Hancock Bank branch where Connie worked. Bennett had a twelve-gauge shotgun. He told everyone in the bank to “get down.” Then, he jumped up on the counter, pointed the shotgun at a bank teller, and asked with determination, “Where’s Connie? Where’s Connie?” The teller, Lauren Williams, replied that she did not know where Connie was. Bennett jumped down. When Bennett was momentarily distracted, Williams went to the break room where she found Connie. Connie begged Williams not to tell Bennett she was there. Williams closed the break room door and Connie called 911 for assistance. Bennett jumped over the counter and forced open the break room door. Williams saw Bennett aim his gun at Connie and shoot Connie three times. The forensic pathologist, Dr. Paul McGarry, testified that Connie died *966 from three gunshot wounds to her side and back inflicted at close range.
¶ 5. After the shooting, Bennett left the bank, got inside his truck, and sped away. Officer Troy Peterson, an investigator with the Harrison County Sheriffs Department, testified that he was notified of the shooting and was advised to look for a green truck, the vehicle Bennett was driving. Officer Peterson located a green truck coming from the direction of the bank. Officer Peterson pursued the truck while other police vehicles came to assist. The truck headed down a dirt road, turned into a wooded cul-de-sac, and stopped. Officer Peterson testified that Bennett could be seen in the truck holding a shotgun. Officer Peterson approached the truck and Bennett told Officer Peterson that he had shot his wife. Officer Peterson testified that Bennett did not appear to be disoriented. After an approximately eight-hour stand-off, Bennett exited the truck and was arrested.
¶ 6. Carl Rhodes, an investigator with the Harrison County Sheriffs Department, testified that he obtained an audio recording of the 911 call made by Connie prior to the shooting. The recording was admitted into evidence and contained the sound of three gun shots and a male voice which stated: “Hey, what’s so funny now, huh?”
¶ 7. At the bench trial, Lauren Williams identified Bennett as the person who had shot and killed Connie at the bank. Williams testified that Bennett was calm and determined on the day of the shooting. Maples testified that she was working at the bank the day Connie was shot. Maples identified Bennett as the man who entered the bank looking for his wife. Maples testified that Bennett had pointed the shotgun at the tellers and demanded to know where Connie was. Then, Bennett pointed the gun at the branch manager and other employees and asked them Connie’s whereabouts. Not receiving an answer, Bennett climbed over the teller counter and into the break room. Maples testified that Bennett seemed angry, but that he was not disoriented or confused.
¶ 8. Dr. Reb McMichael, a forensic psychiatrist, interviewed Bennett and reviewed Bennett’s psychological tests. At trial, Dr. McMichael opined that Bennett had known the difference between right and wrong at the time of the killing. When Dr. McMichael was asked how he arrived at that conclusion, he responded:
Well, I based it on everything that we had. Some of the specifics of the information that was provided to us that led me to that conclusion was the fact that he entered a bank with a weapon looking for his wife; shot her three times and then fled the scene at a high rate of speed. I think one of the bank personnel said they heard him peeling out in the parking lot. And then when he realized he was being pursued, he continued to flee until he was in a cul-de-sac in a park.
And then ... fairly early on when [police] were able to begin communicating with Mr. Bennett, he said, “I’m not going to shoot you.” So he fled indicating that he believed that he had some reason to flee. When he was finally confronted by the officers, he said, “I’m not going to shoot you,” indicating that he knew right from wrong at that point. And then there was a fairly long standoff ... on several occasions, he said, “I don’t want to go to prison.” He was talking about shooting himself, and they said, “Don’t do that.” The officers were trying to talk him out of it. He said, “I don’t want to go to prison. I know I’ve just killed my wife. I don’t want to go to prison.” And I think at some point one of the officers may have even tried to lead him to believe that the victim *967 was still alive, and he said, and I paraphrase, “I shot her three times pointblank range. I know she’s not alive.”
¶ 9. Bennett testified. Bennett stated that he and Connie had been experiencing marital problems in the months prior to the shooting. They disagreed over Connie’s spending time away from home to tend to her ailing mother. Bennett stated that, on or about October 9, 2006, Connie said she was leaving. Then, she moved out. Bennett testified that he became confused when Connie refused to return home. Bennett testified that Connie was seeing a divorce lawyer. Bennett testified that the reason he cashed the home equity loan check for $120,500 was that he wanted to “aggravate” Connie and goad her to return home. Bennett knew that Connie would find out about the cashed check because she worked at another branch of Hancock Bank.
¶ 10. Bennett admits he took the money home and placed it under the couch. Bennett stated that, after hiding the money, he drove to a piece of property he owned and Connie phoned him. Bennett related that, during the telephone conversation, Connie admitted that she was having an affair. Bennett claimed that the next thing he remembered was the sound of police sirens. Bennett stated that it was not unusual for him to keep a loaded shotgun in the truck because he often traveled through the woods and liked to hunt.
¶ 11. The only other witness called to testify for the defense was psychiatrist Dr. Anthony Stock. Dr. Stock testified that he examined Bennett. Dr. Stock testified that Bennett was not suffering from a mental illness at the time of Bennett’s psychological testing. However, Dr. Stock testified that Bennett’s personality had disabled him from coping when he received the news of his wife’s affair. Dr. Stock believed that, at the time of the shooting, Bennett was in a dissociative state in which he may not have been able to distinguish right from wrong.
¶ 12. In rebuttal, Dr. McMichael again took the stand. Dr. McMichael disagreed with Dr. Stock’s opinion that Bennett had been in a dissociative state at the time of the shooting. Dr. McMichael testified that, from his review of Dr. Stock’s opinions, Dr. Stock primarily had based his opinion that Bennett was in a dissociative state at the time of the crime upon Bennett’s later inability to remember the shooting. Dr. McMichael opined that Bennett’s later inability to remember the shooting did not mean that, at the time of the shooting, Bennett was unable to recognize his acts as wrongful. Dr. McMichael stated that memory problems “are very common and determined by many different factors such as not wanting to remember, or being so angry or so excited at a time that you’re not really laying down effective memory. But [the memory loss doesn’t] directly bear on one’s knowledge of his own actions or the wrongfulness of those actions.”
¶ 13. The trial court found Bennett guilty of murder. The trial judge found that, based upon the totality of the evidence, Bennett had known right from wrong and had acted with deliberate design. The court found that Bennett had acted upon a plan from the evidence that he had cashed a $120,500 cashier’s check, entered the bank where his wife worked with a shotgun, left the bank, and then fled to the woods. The court concluded, “Curtis Bennett formed the intent to effect the death of Connie Bennett at a time sufficiently in advance of the actual event so as to satisfy the definition of ‘deliberate design.’ ”
If 14. Bennett filed a motion for a judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. The *968 trial court denied the motion and sentenced Bennett to life in the custody of the Mississippi Department of Corrections. Bennett subsequently filed a motion for an appeal bond, which the trial court denied. Bennett asserts the following issues on appeal, which we quote verbatim:
I. THE EVIDENCE WAS SUFFICIENT FOR A “MANSLAUGHTER” CONVICTION, NOT “MURDER.”
II. THE APPELLANT SHOULD BE ENTITLED TO AN APPEAL BAIL WHILE THE CASE IS PENDING BEFORE THE COURT.
¶ 15. We affirm. We find that the trial court properly found Bennett guilty of murder. Therefore, Bennett was not wrongfully denied an appeal bond.
LAW AND ANALYSIS
I. WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUPPORT BENNETT’S MURDER CONVICTION.
¶ 16. When reviewing the sufficiency of the evidence, this Court must view the evidence and all the reasonable inferences that may be drawn therefrom in the light most favorable to the verdict. Holloman v. State, 656 So.2d 1134, 1142 (Miss.1995). We must determine whether the evidence on any essential element of the charge is so lacking that no reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. Id. “Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the [fact-finder].” Harveston v. State, 493 So.2d 365, 370 (Miss.1986).
¶ 17. Bennett alleges that the evidence could only support a conviction of manslaughter, not murder. Under Mississippi Code Annotated section 97-3-19(l)(a) (Supp.2005), murder is the unlawful killing of a human being without authority of law “[w]hen done with deliberate design to effect the death of the person killed.... ” Manslaughter is “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense .... ” Miss.Code Ann. § 97-3-35 (Rev.2000).
¶ 18. “Heat of passion” has been defined as:
[a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Graham v. State, 582 So.2d 1014, 1017 (Miss.1991). Heat of passion manslaughter requires more than actual “passion and anger.” There must be “such circumstances as would indicate that a normal mind would be roused to the extent that the reason is overthrown and that passion usurps the mind destroying judgment.” Barnett v. State, 563 So.2d 1377, 1380 (Miss.1990) (quoting Calvin v. State, 175 Miss. 699, 703, 168 So. 75, 76 (1936)). Thus, it has been held that “if a man catches his wife in adultery with another man and then and there slays her paramour, the provocation is so great that it extenuates his crime from murder to manslaughter.” Denham v. State, 218 Miss. 423, 429, 67 So.2d 445, 447 (1953). On the other hand, due to the absence of sudden provocation, a long-standing domestic dispute that prompted the husband’s killing of his wife was found to be insufficient to *969 warrant a jury instruction on manslaughter. Graham, 582 So.2d at 1018.
¶ 19. A vital distinction between murder and manslaughter is the element of malice, or deliberate design. Woodham v. State, 800 So.2d 1148, 1156 (¶ 22) (Miss.2001). “The concept of deliberate design ‘generally implies careful and unhurried consideration of the consequences.’ ” Wade v. State, 748 So.2d 771, 776 (¶ 15) (Miss.1999) (quoting Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995)). Heat of passion manslaughter requires the absence of malice. Miss.Code Ann. § 97-3-35; Wade, 748 So.2d at 776 (¶ 15). Thus, to be guilty under section 97-3-35, the defendant must have killed in the heat of passion and without malice and premeditation. Miller v. State, 733 So.2d 846, 849 (¶ 12) (Miss.Ct.App.1998).
¶ 20. Bennett contends that there was no evidence that he had formed a deliberate design to kill Connie and, therefore, he could only have been convicted of manslaughter. We disagree. When viewed in the light most favorable to the verdict, the evidence was sufficient to enable a reasonable fact-finder to conclude that, when Bennett killed Connie, he was acting upon a deliberate design to effect her death.
¶ 21. There was substantial evidence of premeditation in the record. There was evidence that Bennett and Connie had become estranged about a week before the killing. Four days before the killing, Bennett obtained a check for the couple’s home equity credit line. About an hour before the killing, Bennett cashed the check and hid the money under the couch. Then, Bennett drove to Connie’s place of employment with a shotgun. While inside the bank, Bennett calmly and purposefully searched for Connie while threatening other bank employees. Witnesses testified that Bennett was calm and determined, not disoriented or confused. When Bennett found his wife, he shot her three times. Immediately after the shooting, Bennett stated, “Hey, what’s so funny now, huh.” Following the shooting, Bennett had the presence of mind to flee to the woods. During his stand-off with police, Bennett admitted to having shot Connie, Bennett exhibited no memory loss, and Bennett did not mention that Connie had had an affair. In fact, the sole evidence that Connie ever had an affair was Bennett’s own testimony. Dr. McMiehael opined that, when Bennett shot Connie, Bennett knew the difference between right and wrong and was not in a dissociative state that prevented him from appreciating the nature of his actions. The trial court, acting as fact-finder, was entitled to accept Dr. McMichael’s testimony. Viewed in the light most favorable to the State, the evidence was sufficient to enable the trial judge to find that Bennett had formed a deliberate design to kill Connie.
II. WHETHER BENNETT WAS ENTITLED TO AN APPEAL BOND.
¶ 22. The trial court held that Bennett’s motion for an appeal bond should be denied under Mississippi Code Annotated section 99-35-115 (Supp.2005), which states, “[a] person convicted of felony child abuse, sexual battery of a minor or any offense in which a sentence of death or life imprisonment is imposed shall not be entitled to be released from imprisonment pending appeal to the Supreme Court.” Bennett alleges that the trial court erred in denying him an appeal bond since he should have been found guilty of manslaughter, which does not carry a sentence of life imprisonment. Because the trial court properly held that Bennett was guilty of murder, he was ineligible for an appeal bond under section 99-35-115. This issue is without merit.
*970 ¶ 23. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF MURDER AND SENTENCE TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.