IRVING, P.J.,
dissenting:
¶ 33. The majority reverses Cole’s murder conviction because it finds that he was entitled to a heat-of-passion-manslaughter instruction. Cole did not testify. However, the majority finds that Cole’s confession to the police, which was admitted into evidence, provides the evidentiary foundation for a heat-of passion instruction and that the circuit court erred in refusing to give one. In my view, the majority, in arriving at its conclusion, has both misapprehended and misapplied the law. Therefore, I respectfully dissent. I would affirm Cole’s conviction and sentence.
¶ 34. During his interview with the police, Cole made the following statement, which I quote verbatim, regarding his involvement with Norman’s death:
Uh, Tuesday, I can’t recall what, what day it was, but we got together after she got out of her 2:20 class. And we decided to ride around, talk, and go get something to eat. And at the time we was riding around, we was just chilling for a minute and we just started to argue fighting over the stuff that we been through in the last couple of years and stuff we was going through now and we was just kept arguing and kept fighting and uh, one thing just led to another, we was just fighting and just cussing and just ... really just got out of hand and before I knew it I hit her too hard and knocked her out and just panicked and wasn’t thinking straight ... scared, I *642 didn’t know if she was still alive at that moment or what ... but I just panicked and just put her in the trunk and just rode around and try to figure out what I was going to do at this point and just being seared and then ... after a couple of hours, I checked on her and it wasn’t no pulse ... I just really just got scared and just didn’t know what to do ... who to turn to ... or where to go ... so I just rode around for a couple more hours just rode around trying to figure out where I was going to go, what I was going to do, and I just ended up on County Line Road and then I just turned on a ... on this street, I didn’t even know it was Brown Street at the time, I just ended up turned on it ... it was late at night ... and I just seen a couple of abandoned houses and trees and woods and just dropped her off and just covered her up and just dropped her off and just ran; I never said nothing to anybody till this day here. We just kept arguing and fighting and uh, one thing just led to another. We was just fighting and just cussing and just, just really got out of hand and before I knew it I hit her too hard and knocked her out and just panicked and wasn’t thinking straight, scared.
¶ 85. After Cole had given the above statement, without interruption, the following colloquy between him and Detective Sammie Neal occurred:
Q. Let me ask you this Stanley ... did you hit her with an open fist, or I mean open hand or closed fist and where was the area that you hit her at? Do you know?
A. Across the face, in the head.
Q. Okay, when you’re saying across the face ... here or ... Or you know. A. Just.
Q. All over?
A. Yeah, we was just fighting all over ... I can’t even really recall, she was fighting back, I was fighting back ... at a time it coulda [sic] been open fist ... slap ... it was just ... we was just going crazy....
¶ 36. In my judgment, the foregoing statement does not provide evidence of the heat-of-passion element of manslaughter. The majority, citing Bolton v. State, 87 So.3d 1129, 1133-34 (¶¶ 14-15) (Miss.Ct.App.2012), states: “A reasonable jury could have believed this version of events and found the fight Cole described to be adequate provocation.” Maj. Op. at (¶ 29). The majority continues with this statement:
Taking the evidence in the light most favorable to the accused, considering all reasonable inferences in his favor, and considering the jury may not be required to believe any evidence offered by the State, we find that a reasonable hypothetical jury could have convicted Cole of manslaughter. It is the jury’s function to determine the weight and credibility of evidence.
Id. I first point out that Bolton provides no support for resolution of the issue before us, that is, whether a manslaughter instruction should have been given. That a jury may have believed Cole’s version of events is irrelevant if that version does not, as a matter of law, provide an eviden-tiary basis for a manslaughter instruction. See Agnew v. State, 783 So.2d 699, 703 (¶ 10) (Miss.2001). It is the province of the court, not the jury, to determine whether a sufficient foundational basis exists in the evidence to grant an instruction. The jury does not get a chance to weigh in unless and until the court determines that there is evidence in the record that, if believed by the jury, could constitute adequate provocation for manslaughter. It *643 seems to me that the majority’s finding that a manslaughter instruction should have been given simply because the jury may have believed Cole’s version of events is tantamount to saying that it is not the proper role of the trial judge to instruct on the law and that a jury should always be allowed to base its verdict on whom it believes without any legal guidance from the court. That is just not the law.
¶ 37. On two occasions, this Court has determined that a physical altercation was insufficient to justify a heat-of-passion instruction without evidence that the defendant acted out of violent or uncontrollable rage. See Cooper v. State, 977 So.2d 1220, 1223 (¶ 13) (Miss.Ct.App.2007) (pushing, tussling, and/or choking insufficient to support heat-of-passion instruction without evidence that defendant was in a state of uncontrollable rage); Turner v. State, 773 So.2d 952, 954 (¶ 8) (Miss.Ct.App.2000) (pushing and shoving insufficient to require the instruction absent testimony that the defendant was acting out of violent or uncontrollable rage). Just as in Cooper and Turner, there is no evidence here that Cole was in a state of violent or uncontrollable rage. Therefore, his confession alone is insufficient to justify a heat-of-passion-manslaughter instruction.
¶ 38. Additionally, the majority mentions the fact that Cole and Norman “had some history of a violent relationship.” Maj. Op. (¶ 29). However, the Mississippi Supreme Court has held that long-standing domestic disputes are not grounds for a manslaughter instruction. Graham v. State, 582 So.2d 1014, 1018 (Miss.1991). Thus, Cole and Norman’s less-than-harmonious relationship, which ended in a fight and ultimately Norman’s murder, cannot provide the basis for a manslaughter instruction.
¶ 39. Dr. Hayne asked Dr. Danforth to examine Norman’s remains because he did not see Norman’s hyoid bone. His specific statement was: “I wanted her to look at that and see if she could identify the hyoid bone, which is located in the neck area.” Dr. Danforth testified that she saw “a reddish patch” that was dark pinkish in color, about the size of a silver dollar, over Norman’s left eye. However, she did not say that this reddened area was the result of an injury, much less a blow sufficient to cause Norman’s death. Indeed, she could not offer such an opinion even if she believed that to be the case, because she was not qualified to testify as to the cause of death. She admitted as much in the following colloquy:
Q. Dr. Danforth, you don’t testify to— a forensic anthropology — anthropologist, you guys don’t testify to cause and manner of death?
A. No, we do not.
Q. And you can’t do that?
A. No.
¶40. Although the majority opinion does not explicitly state that Dr. Dan-forth’s findings corroborate Cole’s testimony — that he knocked Norman out — it appears that the majority believes that those findings provide some evidentiary support for Cole’s contention that he killed Norman by striking her about the face and head with his hand. In this respect, I note the majority states that according to Dr. Danforth, the reddish spot was evidence of trauma. While Dr. Danforth did mention the reddish patch when asked by defense counsel if she saw any evidence of trauma, it is significant that Dr. Danforth could not, and did not, correlate the injury to anything. Given the fact that Cole dumped Norman’s body in the trunk of his girlfriend’s car and again on the cold ground, any suggestion that the reddish spot was caused by the fighting that allegedly occurred between Norman and Cole would be pure speculation. Moreover, *644 since Norman’s body lay exposed in the woods for approximately two weeks, there is no basis for assuming that the reddish spot was caused by any blows inflicted by Cole. Suffice it to say that there is absolutely no medical testimony that Norman died as a result of being struck about the face and head. In fact, Cole could not say whether he hit Norman with his fist or whether he simply slapped her. The uncon-tradicted medical testimony from Dr. Hayne is that Norman died as a result of a stab wound.
¶ 41. Recently, in Laurent v. State, 94 So.3d 1232, 1235 (¶¶ 12-13) (Miss.Ct.App.2012), this Court found that the defendant’s testimony — that he accidently killed the victim while the two of them struggled over a gun — was insufficient to justify a self-defense instruction. In so finding, we stated:
The problem with Laurent’s argument is that the medical evidence is that Brandi [ (the victim) ] did not die as a result of having been shot. Laurent introduced no medical evidence to the contrary, and although he testified that Brandi collapsed after being shot, he is not competent to assess the cause of Brandi’s death. As stated, Dr. McGarry [ (the forensic pathologist) ] testified to a reasonable degree of medical and scientific certainty that Brandi died from asphyxia due to compressive injuries of the neck and chest.
Id. at (¶ 13). We also noted that it was “unclear from Dr. McGarry’s testimony if he was able to examine the areas of Brandi’s body where Laurent insists that Brandi was shot [but that] Laurent did not challenge Dr. McGarry’s testimony nor did he challenge Dr. McGarry’s findings related to Brandi’s cause of death.” Id. at n. 2. Just as Laurent was not competent to assess the cause of death, neither is Cole. It is noteworthy that Dr. Hayne asked Dr. Danforth to take a look at Norman’s body, and after getting the report from Dr. Dan-forth, Dr. Hayne gave the following testimony during direct examination:
Q. Okay. And based upon your findings — of course, you can explain that— what was the cause of death?
A. I ruled it as a — as consistent with a stab wound of the chest. That injury was slit-like[,] located immediately above the left nipple[,] and measured 1.8 centimeters in length, which would be approximately three-quarters of an inch.
The outside edge of it was somewhat distorted[,] secondary to decomposition change or putrefaction breakdown of the body. The body had been exposed for a period of time.
Q. Okay. And the manner of death?
A. I ruled the manner of death as homicide, sir.
[[Image here]]
Q. Okay. Dr. Hayne, just a few more questions. Was there any blunt force trauma to the head?
A. I did not see that, Counselor.
Q. Okay. And so what about any cranial fractures?
A. I did not see that, Counselor. The cranial vault was opened[;] the brain was examined; and I did not see fractures to the base of the skull and the skull cap itself.
Q. Okay. So any claim of an injury to the head—
[[Image here]]
Q. Your finding of the cause of death was a stabbing, correct?
A. It was consistent with a stab wound to the chest, sir.
Q. Or any kind of head injury at all?
A. I didn’t see that, [Counselor. Of course, a lot of the soft tissue was gone. *645 It was skeletal, so I would not see a soft tissue injury.
Q. Dr. Hayne, blunt force trauma, what would it take to—
[[Image here]]
Q. How much force would it take to cause — an injury to the head to cause a death?
A. Normally, it’d take a considerable amount of force, counselor. It would not necessarily have to be a fracture. You can have bleeding inside the cranial vault involving the brain or the spaces around the brain without fracture. A strong blow could produce that type of injury.
Q. But this was not found in this case?
A. I did not see evidence of that, no, counselor.
¶42. During the redirect examination of Dr. Hayne, the following colloquy occurred:
Q. Just a follow-up on the last question. You testified earlier to a medical degree of certainty that this cause of death was consistent with a stab wound, correct?
[[Image here]]
Q. And to a medical degree of certainty, you can tell us that this was consistent with a stab wound?
A. It’s consistent with a stab wound, and I ruled that and signed an affidavit to that effect, sir.
Q. Okay. Which is a very high standard in the medical field?
A. It’s with reasonable medical certainty, which is the highest standard one can go.
¶ 43. It is clear that the medical evidence here, as did the medical evidence in Laurent, contradicts Cole’s theory of death. Further, as was the case with the defendant in Laurent, Cole is not competent to state the cause of death. Additionally, I should point out that Cole’s contention that he knocked Norman out is not unlike the defendant’s statement in Laurent. In both cases, the defendants contended that their actions caused the victim’s death, despite the absence of medical evidence to support it. As Laurent’s testimony was insufficient to warrant the giving of a self-defense instruction, Cole’s and Dr. Danforth’s testimonies also are insufficient to warrant the giving of a manslaughter instruction. Dr. Hayne examined Norman’s skull, opened the cranial vault, and found no evidence that Norman could have been killed by a blow to the head. While it is true that, unlike Dr. McGarry in Laurent, Dr. Hayne did not testify to a reasonable degree of medical and scientific certainty as to the cause of Norman’s death, he did, in his expert capacity, testify essentially that it was medically impossible for Norman to have died as a result of being struck by Cole in the manner that Cole testified. And finally, Dr. Hayne testified, in his expert capacity, without contradiction, that Norman’s death was consistent with a stab wound to the chest. There is no evidence that anyone other than Cole could have caused the stab wound.
¶ 44. Therefore, I dissent. I would affirm Cole’s conviction and sentence.
CARLTON, J„ JOINS THIS OPINION. BARNES, J., JOINS THIS OPINION IN PART.