# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00275-SCT

*JANARIOUS MEKALL JONES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/23/2020 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| TRIAL COURT ATTORNEYS: | STEVEN KILGORE |
| | THOMAS P. WELCH, JR. |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JUSTIN T. COOK |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA BYRD |
| DISTRICT ATTORNEY: | STEVEN KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/03/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     The Grand Jury of Scott County indicted Janarious Jones for first-degree murder pursuant to Mississippi Code Section 97-3-19(1)(a) (Rev. 2020).  Following a trial in Circuit Court of Scott County, the jury convicted Jones of manslaughter pursuant to Mississippi Code Section 97-3-35 (Rev. 2020).  Jones was then sentenced to prison for a term of twenty years, with five years suspended.  After denial of his post-trial motions, Jones appealed,

arguing that (1) the circuit court erred by not requiring the jury to specify which theory of manslaughter the jury used to convict Jones; (2) the State presented insufficient evidence to support a heat-of-passion manslaughter conviction; and (3) the circuit court committed reversible error when it dispersed the jury for lunch. Finding no error, this Court affirms Jones's conviction and sentence.

**FACTS AND PROCEDURAL HISTORY**

¶2. Kelvin Towner, Jr. (Junior), was eighteen years old at the time of the trial in October 2020. Junior testified that on December 14, 2017, he got into a fight with Ty McCurdy at Mark Wilson's house over a pair pants that Junior believed were stolen. The next day, after Junior returned home from school around 3:30 p.m., Junior found his father, Kelvin Towner, Sr. (Calvin), waiting for him. At that time, Calvin informed Junior that "them boys said they were gonna jump on [Junior] or something." In response, Junior suggested that he and his father retrieve their chicken box "down the road."[1]

¶3. After their chat, Junior and Calvin went to get the chicken box. Calvin drove his vehicle, and Junior rode in the passenger seat. Junior testified that while en route to get the chicken box, Junior saw McCurdy, Jones, and about five or six other young people standing outside Wilson's house. According to Junior, Jones approached the vehicle as Junior and Calvin rode by. After Junior and Calvin retrieved the chicken box, they made their way back home.

¶4. On their way home, as Junior and Calvin approached Wilson's house the second time,

---

[1] The chicken box was described as a box with holes in it that is used to transport live chickens.

Junior saw Jones holding a handgun. Junior testified that Calvin reacted by grabbing a shotgun from the backseat of the vehicle and placing it in his lap. Calvin then slowed the vehicle down and opened his door. The next thing Junior remembers was Jones shooting. Junior testified that Jones's first shot missed but that the second shot hit Calvin. Junior testified that, after the shooting, everyone started running. Junior then saw his father lean back in his seat. Junior testified that he threw the shotgun outside the vehicle, jumped on his father's lap and drove away.[2]

¶5.     Cornelius Patrick also testified at Jones's trial. On the day of the shooting, Patrick was driving home from work but stopped at Wilson's house when he saw Jones standing beside the road. Patrick stated that he knew Jones and that he was related to him. Patrick acknowledged the "40-degree weather" that December day and testified that Jones was just standing on the side of the road with no shirt on. According to Patrick, Jones "was mad, he was angry. You could see it." Patrick further testified that when he arrived, Jones was pacing and not talking.

¶6.     Patrick testified that he initially did not see Jones with a gun. Later, however, Patrick noticed that Jones had somehow obtained Patrick's gun that Patrick kept on the floorboard of his vehicle. Patrick testified that he wanted to retrieve the gun from Jones but he never could because Jones "was angry."

---

[2] We note that Dr. Mark LeVaughn, chief medical examiner at the Mississippi Forensics Laboratory, testified that Calvin died as a result of a close-range gunshot to the forehead.

¶7.    Patrick testified that he then saw Calvin's vehicle "coming back through" and head toward the Towners' home. Patrick noticed that as Calvin's vehicle approached this second time, it slowed down and that Calvin opened his door. According to Patrick, he saw Jones point the gun toward Calvin's vehicle. Patrick then heard gunshots, but he never saw anyone shoot because he had turned away. Patrick testified that he did not see anyone else at the Wilson house with a gun.

¶8.    After the gunshots, Patrick testified that he heard someone say, "He's shot. He's shot in the head." According to Patrick, he then saw Calvin's vehicle travel down the road and said that "it was swerving like maybe somebody on the passenger side was, you know, trying to steer it because it was going all over and almost went off the road and came back over." Patrick also saw Jones run away.

¶9.    Patrick testified that his brother, who had been with him during this time, picked up shell casings from the scene. Law enforcement later asked Patrick for his gun. Patrick testified that he did not have the gun at that time but that Maurice Jones had the gun. Patrick testified that he went and retrieved the gun from Maurice and gave the gun and the shell casings to law enforcement.

¶10.   Willie Wilson lived close to the house of Mark Wilson. On the afternoon of the incident, Willie testified that he saw Junior and Calvin drive by, and he then heard gunshots. After hearing the gunshots, Willie went to Mark Wilson's house to investigate. Willie testified that, initially, he did not know if anyone was hurt—because he did not see the shooting—but he soon learned that Calvin was "on the side of the road here, dead." Willie

4

said that he saw a shotgun lying in the middle of the road.

¶11. After the shooting, Willie called Deputy Michael Holifield and reported what had just happened. Deputy Holifield instructed Willie to stand by the gun and to make sure it did not move, which Willie did. Before any officers arrived, however, Willie testified that Jones came to him from the bushes near Willie's sister's house. Willie testified that he told Jones that Calvin was dead. According to Willie, Jones then appeared "upset." Willie saw Jones throw a cell phone and run around the area chanting "Kill me. Kill me."

¶12. Deputy Michael McCarty of the Scott County Sheriff's Office was dispatched and was the first law enforcement officer to arrive on the scene. Deputy McCarty testified that he saw people crowding around a vehicle near the scene of the incident. Deputy McCarty continued that after he ordered everyone to clear the vicinity of the vehicle, he discovered a deceased African-American male inside the vehicle with a gunshot wound to his head. This person was later identified as Calvin.[3]

¶13. Another officer, Deputy Bryant Creel, also of the Scott County Sheriff's Office, responded to the scene. Deputy Creel testified that he had been made aware that Jones was the shooter and that, when he arrived, Jones approached him. According to Deputy Creel, Jones had blood on him and was scratched up badly. Deputy Creel learned from Jones that Jones's injuries were from "briars in a bush." Deputy Creel then called for medical help to treat Jones's injuries. At that time, Deputy Creel did not place Jones under arrest but, instead, merely detained Jones. Medical help arrived and transported Jones away from the

---

[3]Additionally, Deputy McCarty testified that he found a small-caliber pistol in Calvin's left back pocket.

scene to a hospital. Jones was later taken into custody after receiving treatment.

¶14. Investigator Donald Simpson of the Scott County Sheriff's Office arrived on the scene to gather information and to collect evidence. Investigator Simpson took photographs and obtained contact information from witnesses. Later, after Jones was arrested, Investigator Simpson interviewed Jones.

¶15. Before his interview, Jones was advised of his *Miranda*[4] rights, which he waived. Jones then gave an oral statement. Investigator Simpson testified that after Jones gave his oral statement, Jones also gave a written statement that was dictated by another officer. Jones's written statement, read into the record, is as follows:

> We were sitting in Mark Wilson's yard today, 12/15/17, Friday, about 2:50 p.m. Calvin Towner drove up in his Impala. He rolled in the yard and he was upset about his son. I told Calvin that his son, Junior Towner, had gotten in a fight with Ty Mccurdy. Calvin Towner told me and Ty that if they fight, he was going to shoot up everybody. I saw the bus come down, and I saw Calvin come back in his white Dodge truck. Junior Towner got in the truck with his dad. I saw the butt of a shotgun in the truck. Everybody pointed at a pistol and looked at me. I picked up the pistol and had the gun beside my leg. Calvin stuck the shotgun out the window. I raised the pistol and fired three shots. I thought I was shooting high. After shooting I dropped the pistol and took off—dropped the pistol and took off running in the woods. I sat in the woods for a while and heard someone say Calvin was dead. I came out of the woods, and I flagged down the police and sat down beside the roadway. I don't know where the pistol I shot and dropped went—went to. I just dropped and run.

According to Investigator Simpson, there were a few pieces of the oral statement that were missing in the written statement. Investigator Simpson testified that Jones stated orally that Calvin had "disrespected" Jones and that Calvin had to answer for that. Investigator

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

6

Simpson testified that Jones had also said that he knew Calvin wanted to shoot Jones; however, Jones never stated that Calvin fired a shot.

¶16. At trial, Jones also testified in his own defense. On the morning of the incident, Jones said that Calvin drove up to Jones's house. According to Jones, Calvin thought Jones was involved in the prior fight over the stolen pants, but Jones testified that he told Calvin he was not involved. Jones testified that Calvin still threatened Jones despite Jones's explanation.

¶17. Later that day, Jones testified that he saw Calvin drive by the Wilson house and that Calvin was holding a shotgun. Before Calvin returned the second time, Jones testified that he retrieved a gun because everyone had told him that Calvin was coming back. When Calvin returned, Jones testified that Calvin hit the brakes and "skidded down the road." According to Jones, Jones saw Calvin's door open, and he then saw Calvin point the shotgun at him. Jones admits that he fired his gun after seeing Calvin with a gun.

¶18. After the shooting, Jones stated that he ran away from the scene because he feared for his life. Jones testified that he returned when he learned of Calvin's death and waited for law enforcement. Jones denies ever feeling "disrespected" by Calvin but said that he "was scared for his life." Jones disagrees with Patrick's testimony that Jones was angry or that Patrick was afraid to retrieve the gun. Jones also disagreed with Patrick that Jones ever pointed a gun at Calvin's vehicle when it passed by the Wilson house the second time.

¶19. On August 7, 2018, Jones was indicted for the first-degree murder of Calvin. During the trial, the jury received various instructions and was specifically instructed that

> [i]f you find from the evidence in this case beyond a reasonable doubt that the Defendant, Janarious Mekall Jones, did kill Kelvin L. Towner, a human being,

without malice, in the heat of passion, by the use of a dangerous weapon not in necessary self-defense and without authority of law, then you shall find the Defendant guilty of manslaughter.[5]

¶20.     Before the jury returned its verdict, but during deliberations, the circuit court dispersed the jury for lunch.  Jones's counsel objected to the jury's dispersal and suggested that lunch should be ordered in instead.  Jones's counsel then moved for a mistrial, which the circuit court denied.  The circuit court based denial of a mistrial on the fact that there was never a request for sequestration.

¶21.    After Jones's trial, the jury returned a guilty verdict for the lesser-included offense of manslaughter.  The circuit court then sentenced Jones to serve a term of twenty years in the custody of Mississippi Department of Corrections, with five years suspended, leaving Jones fifteen years to serve.  Following the denial of his post-trial motions, Jones appeals.

**ISSUES PRESENTED**

I.     Whether the jury's verdict must specify the theory of manslaughter, heat-of-passion or imperfect self-defense, of which the defendant was found guilty.

II.     Whether the State presented sufficient evidence to support Jones's conviction of heat-of-passion manslaughter.

III.     Whether the circuit court erred by dispersing the jury.

**STANDARD OF REVIEW**

¶22.    "Whether to grant or deny proposed jury instructions is within the sole discretion of the circuit court."  *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012) (citing *Newell v. State*,

---

[5] The jury was instructed also on the definition of heat-of-passion and on the elements of an imperfect self defense.

8

49 So. 3d 66, 73 (Miss. 2010)). "Thus, this Court reviews the grant or denial of jury instructions for an abuse of discretion." *Id.* (citing *Newell*, 49 So. 3d at 73). Once the jury has returned a guilty verdict and the defendant is convicted, this Court cannot reverse that conviction "short of a conclusion on our part that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty." *Higgins v. State*, 725 So. 2d 220, 225 (Miss. 1998) (internal quotation marks omitted) (quoting *May v. State*, 460 So. 2d 778, 781 (Miss. 1984)). Also, the "standard of review for a post-trial motion is abuse of discretion." *Prater v. State*, 18 So. 3d 884, 893 (Miss. Ct. App. 2009) (internal quotation marks omitted) (quoting *Howell v. State*, 860 So. 2d 704, 764 (Miss. 2003)).

## DISCUSSION

I. **Whether the jury's verdict must specify the theory of manslaughter, heat-of-passion or imperfect self-defense, of which the defendant was found guilty.**

¶23. Jones first argues that the circuit court erred when it failed to require the jury to specify which theory of manslaughter the jury used to convict him. Jones contends that he has no way of knowing whether the jury found him guilty under a heat-of-passion theory or under an imperfect-self-defense theory. For the following reasons, this issue has no merit.

¶24. The jury was instructed that

> [i]f you find from the evidence in this case beyond a reasonable doubt that the defendant, Janarious Mekall Jones, did kill Kelvin L. Towner, a human being, without malice, in the heat of passion, by the use of a dangerous weapon not in necessary self-defense and without authority of law, then you shall find the defendant guilty of manslaughter.

9

This instruction tracks Mississippi's heat-of-passion-manslaughter statute, Section 97-3-35, which provides that "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without the authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code. Ann. § 97-3-35 (Rev. 2020). Also, the jury's verdict reads: "We, the jury, find the defendant, Janarious MeKall Jones, Guilty of Manslaughter."

¶25. Mississippi Rule of Criminal Procedure 24.2(c) provides that "[i]f the jury is instructed on different counts, offenses, or degrees of offenses, the verdict shall specify each count, offense or degree of which the defendant has been found guilty or not guilty." The comment states that this rule "requires the jury to specify the particular counts and degrees of the offense(s) of which it finds the defendant guilty or not guilty. These provisions ensure that the verdict will be clear and unambiguous." Miss. R. Crim. P. 24.2(c) cmt. Further, "[t]he general rule is that the court may require the jury to clear up an indefinite and ambiguous verdict, and '[i]ndeed, it is the duty of court to direct the jury to reconsider their verdict when satisfied that there has been a palpable mistake.'" *Pace v. State*, 242 So. 3d 107, 116 (Miss. 2018) (internal quotation marks omitted) (quoting *Anderson v. State*, 231 Miss. 352, 95 So. 2d 465, 467 (1957)).

¶26. Jones points out, as we noted previously, that the jury also was instructed on the definition of heat of passion and the elements of imperfect self-defense. Jones argues that since the jury received instructions on the definitions and elements of both of these theories of manslaughter, under Mississippi Rule of Criminal Procedure 24.2(c), the verdict should

10

have specified under which theory he was found guilty instead of generally finding Jones guilty of manslaughter.

¶27.    The State agrees that two theories of manslaughter exist under Section 97-3-35.  The State, however, argues that Rule 24.2(c) itself does not contemplate Section 97-3-35 because the statute does not separate manslaughter into degrees.  *See* Miss. Code Ann. § 97-3-35. Regardless, the State asserts that alternative factual theories before a jury do not warrant reversal because the jury is capable of discarding insufficient factual theories and choosing those that are meritorious.

¶28.    In ***McCarty v. State***, 247 So. 3d 260 (Miss. Ct. App. 2017), our Court of Appeals considered a similar question.  The jury in that case also received multiple instructions on various factual theories including depraved-heart murder, culpable-negligence manslaughter, and heat-of-passion manslaughter. ***Id.*** at 266.  Then, "the jury returned a verdict finding [the defendant] 'guilty of manslaughter.'" ***Id.***  In regards to alternative factual theories presented to a jury, the Court of Appeals reasoned that

> "[R]eversal is not warranted when the jury is presented with alternative factual theories, but one of those theories is factually inadequate to sustain the conviction."  "This is because 'jurors are well equipped to analyze the evidence.[']"  We presume that the "jury was perfectly capable of sifting through the evidence and was able to discard any factually insufficient theories."  Therefore, in the present case, the manslaughter conviction must be affirmed if the State presented sufficient evidence of either heat-of-passion manslaughter *or* culpable-negligence manslaughter—even if we find that "one of those theories is factually inadequate to sustain the conviction."

***Id.*** at 268 (citations omitted).  Further, the defendant in that case argued that "her conviction must be set aside if there is insufficient evidence of *either* 'culpable negligence' *or* 'heat of

11

passion.'" *Id.* n.5. The Court of Appeals, however, held that

> [A] general guilty verdict must be set aside if one of the possible bases of conviction is held unconstitutional or "contrary to law"—i.e. "*legally inadequate.*" [*Griffin v. United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991)]. However, when, as in this case, the defendant argues that the case was submitted to the jury on a "*factually* inadequate theory," a general verdict will by upheld as long as there is sufficient evidence to support an alternative ground for conviction." *Id.*

*Id.* (alteration in original). We agree with the Court of Appeals' analysis.

¶29. We conclude that Section 97-3-35 is not divided into differing counts or degrees. Heat of passion and imperfect self-defense have been recognized by this Court as factual theories, both encompassed within Section 97-3-35, under the same overarching heat-of-passion-manslaughter statute. *Cook v. State*, 467 So. 2d 203, 207 (Miss. 1985) (recognizing Section 97-3-35 includes two theories of manslaughter, heat of passion and imperfect self-defense). Therefore, these theories are not degrees of an offense that must be specified per Rule 24.2(c). Regardless, the jury's general verdict should be upheld if sufficient evidence supported Jones's manslaughter conviction, even when the jury was instructed on two factual theories. *McCarty*, 247 So. 3d 260. This is so because the "jury was perfectly capable of sifting through the evidence and was able to discard any factual insufficient theories." *Id.* (internal quotation marks omitted) (quoting *Batiste v. State*, 121 So. 3d 808, 840 (Miss. 2013)). For these reasons, the circuit court did not err by not requiring the jury to specify its verdict.

**II.    Whether the State presented sufficient evidence to support Jones's conviction of heat-of-passion manslaughter.**

¶30.    Next, Jones argues that his heat-of-passion-manslaughter conviction is not supported by the evidence.    Jones declines to brief, however, whether the evidence supports a conviction based on an imperfect-self-defense theory because he asserts that "this Court cannot soothsay which theory of manslaughter the jury chose."    For the following reasons, this issue is also without merit.

¶31.    Previously, this Court has defined heat-of-passion as:

> A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter.  Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at a time.  The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Phillips v. State*, 794 So. 2d 1034, 1037 (Miss. 2001) (quoting *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001)).    "This passion should be an emotion brought about by some insult, or provocation, or injury, which would produce in the minds of ordinary men 'the highest degree of exasperation.'"  *Id.* (quoting *Graham v. State*, 582 So. 2d 1014, 1018 (Miss. 1991)).  Accordingly, Jones argues that no evidence shows that he acted with "uncontrollable rage, hatred, anger, terror or furious resentment toward Calvin."    Instead, Jones argues he acted in self-defense when he shot Calvin.

¶32.    As noted above, however, the evidence contradicts Jones's insufficient-evidence argument.  Patrick testified that he stopped by at the scene because Jones was shirtless in 40-degree weather, frantically pacing in the yard in anger; according to Patrick, Jones was

essentially unapproachable. Patrick also testified that after Calvin and Junior drove by once, Jones took Patrick's gun out of Patrick's car and that Patrick could not retrieve it from Jones because of Jones's anger. Additionally, Jones himself told investigators that Jones was angry with Calvin because Calvin had disrespected Jones and that Calvin had to answer for that. Further, Jones admitted that "I fired," albeit while claiming Calvin had a gun pointed at him.

¶33. While Jones argues for reversal because there was insufficient evidence to support a heat-of-passion-manslaughter conviction, again, either theory, heat of passion or imperfect self-defense, can support a manslaughter conviction if either theory is supported by sufficient evidence. *McCarty*, 247 So. 3d 260.[6] We conclude that sufficient evidence supported the jury's verdict. Based upon the evidence before it, the jury could reasonably conclude that Jones shot Calvin out of anger and rage after being provoked by Calvin's prior confrontation. For this reason, we conclude that Jones's conviction was supported by the evidence.

### III. Whether the circuit court erred by dispersing the jury.

¶34. Jones's final argument is that the circuit court erred when it dispersed the jury for lunch. Jones cites *Wilson v. State*, which states that

> As to the dispersal of the jury, the defendant in a prosecution for felony is entitled to have the jury kept together without exception from the time it is selected until finally discharged. The separation of even one juror in such cases is an irregularity which will vitiate the verdict. Even at the request of the defendant, they cannot be dispersed in a capital case.

---

[6] Additionally, when the record contains evidence sufficient to support a jury finding guilty of murder, the defendant will not be permitted to complain that he was convicted of manslaughter. *Cook*, 467 So. 2d at 209 (citing *Hubbard v. State*, 437 So. 2d 430, 438-39 (Miss. 1983)). Here, arguably, sufficient evidence would have supported a conviction for murder.

14

*Wilson v. State*, 248 So. 2d 802, 802 (Miss. 1971) (citations omitted). Jones also cites *Kirk v. State*, 160 So. 3d 685, 702 (Miss. 2015), in which this Court "caution[ed]" against jury dispersal, even in non-capital cases. Additionally, Jones suggests that a note submitted from the jury after it returned from lunch asking about evidence is evidence itself that the jury was compromised by improper conduct.

¶35. In Mississippi, jury sequestration is governed by Mississippi Rule of Criminal Procedure 18.8. Rule 18.8 mandates sequestration for death-penalty cases. Miss. R. Crim. P. 18.8(a). In all other cases, however,

> [T]he jury may be sequestered on request of either the defendant or the prosecuting attorney made at least forty-eight (48) hours in advance of the trial. The court may grant or refuse the request to sequester they jury. The court may, on its own initiative or upon request of either party, sequester a jury at any stage of a trial.

Miss. R. Crim. P. 18.8(b). Furthermore, this Court has also held that while sequestration is mandatory in death-penalty cases, *see Simmons v. State*, 805 So. 2d 452 (Miss. 2001), it is discretionary in other cases, *see Baldwin v. State*, 732 So. 2d 236 (Miss. 1999). As for dispersal, "[e]xcept in cases in which the jury has been sequestered, the court *may* permit the jurors to disperse after their deliberations have commenced, instructing them when to reassemble, and giving the admonitions of Rule 18.7." Miss. R. Crim. P. 23.1(b) (emphasis added).[7]

¶36. Regarding the note the jury sent after lunch, any argument that the jury improperly

---

[7] Mississippi Rule of Criminal 18.7 instructs trial courts to provide various admonitions to members of the jury that essentially restricts their ability to communicate aspects of the case.

15

conducted itself is speculative. Juries submit questions regularly. The jury was instructed, before lunch, not to discuss the case with anyone. "It is presumed that jurors follow the instructions of court." *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985) (citing *Payne v. State*, 462 So. 2d 902, 904 (Miss. 1984)). Thus, the State argues that "this Court should conclude that no error occurred." *See Kirk*, 160 So. 3d at 702 (holding that no reversible error occurs in the failure to sequester jurors when no prejudicial effect is shown).

¶37. We conclude that this issue, too, has no merit because Jones never requested sequestration. Since he made no such request, under Rule 18.8(b) and *Baldwin*, the circuit court had discretion (as this was a non-capital case) whether or not to order sequestration. Therefore, the circuit court did not err by dispersing the jury for lunch when it had the discretion to do so and a request to sequester the jury was not timely made.

## CONCLUSION

¶38. We conclude that Jones's assignments of error are without merit. We, therefore, affirm his conviction and sentence.

¶39. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**

16